**PHILADELPHIA NEWSPAPERS, INC.**

v.

**The BOROUGH COUNCIL, MAYOR, MANAGER AND DIRECTOR OF PUBLIC WORKS OF the BOROUGH OF SWARTHMORE.**

Civ. A. No. 74–1569.

United States District Court,
E. D. Pennsylvania.

Aug. 8, 1974.

Declaratory Judgment Aug. 13, 1974.

Bruce W. Kauffman, Philadelphia, Pa., for plaintiff.

G. Guy Smith, Media, Pa., for defendants.

## OPINION

FOGEL, District Judge.

### STATEMENT OF THE ISSUE AND HISTORY OF THE CASE

This case presents the following issue for resolution, apparently one of first impression in the federal courts:[1]

Does the protection of the First and Fourteenth Amendments to the Consti-

---

[1]. We are informed that a similar action was brought in the United States District Court for the District of New Jersey, on June 28, 1974, Bulletin Company and Philadelphia

tution invalidate, *pro tanto*, an Ordinance and a Resolution of the Council of the Borough of Swarthmore, Pennsylvania, insofar as they are applied *first*: to totally prohibit the placement of newspaper boxes anywhere on the public sidewalk strips within the Borough, or *second*: to limit the placement of newspaper boxes to a three foot strip of the public sidewalk adjacent to premises within the business district of the Borough, during business hours, when such newspaper boxes are so placed by the tenant, owner or occupant of a business establishment which customarily sells newspapers?

This action was brought on June 20, 1974, by plaintiff Philadelphia Newspapers, Inc., publisher of the Philadelphia Inquirer (hereinafter referred to as PNI), against defendant officials of the Borough of Swarthmore, Pennsylvania (hereinafter referred to as the Borough), seeking declaratory and injunctive relief against enforcement of Borough Ordinance No. 715, passed on March 8, 1971, insofar as it prohibits the placement of newspaper boxes along streets and on sidewalks within the Borough.

An initial hearing was held on June 21, 1974, at the conclusion of which a temporary restraining order was issued ordering the Borough to replace two newspaper boxes located at Rutgers Avenue near the Post Office, and at the intersection of Yale Avenue and South Chester Road, which it had removed a short time before this action was instituted. By consent of the parties, this temporary restraining order was to remain in effect until the subsequent

hearing, which the parties agreed could be a final one because of the identical character of the factual and legal issues pertinent to the grant or denial of temporary and permanent relief. Accordingly, a final hearing was held on July 15 and 16, 1974, and the temporary restraining order was continued in effect, again with the consent of the parties, pending final decision of this Court.

### JURISDICTION

Before turning to the merits of the case, a brief discussion of the basis for our jurisdiction is in order.

■ Jurisdiction is founded on 28 U.S.C. § 1343(3), which grants to the District Courts original jurisdiction "[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States. . . . " The substantive counterpart to § 1343(3) is 42 U.S.C. § 1983, which establishes a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution. . . . "[2]

■ PNI alleges deprivation by defendant officials of rights secured under the First and Fourteenth Amendments to the Constitution of the United States.[3]

---

Newspapers, Inc. v. Borough of Wildwood Crest, C.A. No. 74–970, in which Chief Judge Cohen issued a temporary restraining order enjoining the Borough from prohibiting the placement of newspaper boxes at 17 locations within the Borough. A consent order was subsequently signed in the case.

2. A corporation is a "person" within the meaning of 28 U.S.C. § 1343, McCoy v. Providence Journal Co., 190 F.2d 760 (1st Cir. 1951), cert. den., 342 U.S. 894, 72 S.Ct. 200, 96 L.Ed. 669, and within the meaning of

42 U.S.C. § 1983, Adams v. City of Park Ridge, 293 F.2d 585 (7th Cir. 1961). See Antieau, Federal Civil Rights Acts: Civil Practice § 31 (1971), and cases cited therein.

3. Municipal ordinances and the actions in office of municipal officials constitute state action and fall within the prohibitions of the Fourteenth Amendment. Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

The challenged ordinance provides as follows, in pertinent part:

Section 1. DEFINITIONS

The term "Street", as used herein, refers to the public easement or right of passage as shown on the Borough map or plan of streets. A standard Borough street consists of a paved roadway, 25 feet wide, with a sidewalk strip 12½ feet wide on either side. "Property line": The legal side lines of a public street or highway. "Sidewalk strip": The portion of a street or highway on either side of the roadway, normally consisting of the curb, the unpaved grass plot, the paved sidewalk, normally four feet wide, and the remaining unpaved space extending to the property line.

Section 2. PUBLIC USE OF STREETS

With the exception of public signs, barriers, poles, meter stands and similar municipal equipment and fixtures, and the further exception of temporary obstructions incidental to loading and unloading, and to construction work, it shall be unlawful to obstruct the free public use of the streets of the Borough, or to make any commercial use thereof. Encroachments upon, under or over public streets are unlawful, and may be removed by the Borough officers and their agents, regardless of how long such encroachments have existed. This section shall not prohibit the Borough Council from making exceptions in the cases of awnings, signs or other devices where the encroachment is temporary in nature, the minimum amount necessary to accomplish the owner's purpose, and does not inconvenience the public or interfere with free passage.

\* \* \* \* \* \*

Section 5. SEVERABILITY

The provisions of this ordinance are severable. If any of its provisions shall be held to be invalid, the remaining provisions shall not be affected thereby. The Council hereby declares that said provisions would have been enacted notwithstanding deletion of the invalid provisions.

\* \* \* \* \* \*

Section 7. PENALTIES

Any person who shall violate any of the provisions of this ordinance shall be subject to a fine or penalty not exceeding $300.00 for each such offense, and in default of payment thereof, to imprisonment up to ten days. In assessing penalties the Justice of the Peace shall take into consideration whether or not the violation was wilful or unintentional.

This ordinance was modified by Resolution of May 13, 1974, which provides as follows:

In Re: SIDEWALK ORDINANCE NO. 715, APPROVED MARCH 8, 1971.

WHEREAS, Subsection 74 of Section 1202 of the Borough Code empowers boroughs to enact such ordinances, by-laws, rules and regulations as may be expedient for the proper management, care and control of the borough, and its trade, commerce and manufactures; and

WHEREAS, the Council of the Borough of Swarthmore believes that the prosperity of persons earning their living in the Business District, as delineated in the zoning ordinance, would be promoted, without detriment to the public welfare, if temporary, limited used of public sidewalks in front of their establishments for display of goods and advertising of services and facilities were permitted;

NOW, THEREFORE, the Council does hereby resolve that it shall be lawful for any tenant, owner or occupant of premises in the Business District of the Borough, so long as this Resolution remains in effect, to utilize not more than three feet of the public sidewalk adjoining his said premises for the orderly advertising and display of goods, wares and merchandise, and services and facilities available in or from said place of business. The portion of sidewalk so utilized shall be

closest to the store front, and not wider than the width of such store, office or shop along such street.

Any owner, occupant or tenant who makes use of such portion of the public sidewalk pursuant to this authorization shall thereby be held to agree to the following rules and regulations, upon which the privilege is conditioned:

1. The privilege is revocable, in whole or part, by mo- [omitted from Exhibit "B" to the Complaint] Council, at anytime, and without prior notice, or obligation to furnish reasons for such revocation.

2. The Borough is not hereby surrendering its jurisdiction over the public sidewalks as same exists by law, and as set forth more particularly in Ordinance No. 715, approved March 8, 1971. Rather the Borough, in passing this resolution, is granting a special exception, as authorized in Section 2, of said ordinance which section concludes with the following words:

"This section shall not prohibit the Borough Council from making exceptions in the cases of awnings, signs or other devices where the encroachment is temporary in nature, the minimum amount necessary to accomplish the owner's purpose, and does not inconvenience the public or interfere with free passage."

3. The Borough Council may adopt further rules and regulations, from time to time. Publication thereof in a newspaper circulating in the Borough shall immediately bind all parties subject to the terms of this Resolution.

4. No permanent signs, stands, equipment or enclosures shall be erected upon or suspended over any portion of the public sidewalk. All equipment and displays shall be taken indoors each afternoon or night upon the closing of the business or establishment involved, and the sidewalk shall be left broom clean and in proper state of repair at all times. In addition, the owner, tenant or occupant shall comply with all orders of the Chief of Police and of the Fire Marshal.

5. It is a further condition of this authorization and exception that each person availing himself thereof agrees to carry suitable liability insurance to protect him as well as the Borough against all claims of personal injury or property damage arising out of such utilization of the sidewalk for the purposes described in this resolution.

PASSED, this 13th day of May, 1974.

PNI asserts that the Ordinance of March 8, 1971 (hereinafter the Ordinance), and the Resolution of May 13, 1974 (hereinafter the Resolution), construed together, are unconstitutional to the extent that they prohibit the placement of newspaper boxes on the public sidewalks of the Borough, while permitting certain other uses of the streets and sidewalks which are not entitled to the protection of the First and Fourteenth Amendments.

Several other preliminary jurisdictional matters must be discussed before we reach the merits of plaintiff's claim.

■ *First*, we are satisfied that a single federal judge can decide the constitutionality of a municipal ordinance, without the necessity of convening a three-judge court pursuant to 28 U.S.C. §§ 2281, 2284. Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967).

*Second*, a more difficult problem arises with respect to the declaratory and injunctive relief sought by plaintiff. The ordinance and modifying resolution have penal sanctions, but there is no pending prosecution thereunder against PNI. The two newspaper boxes which were the subject of the temporary restraining order were first placed in the Borough during the first week of April,

1974. Plaintiff received the following letter on or about April 15, 1974:[4]

The Philadelphia Inquirer
400 N. Broad Street
Philadelphia, Pa. 19081

Dear Sirs:

Your newspaper vending machines on Swarthmore Streets violate Ordinance #715 passed March 8, 1971. The ordinance provides for a $300 fine for each offense.

You are hereby ordered to remove the vending machines immediately.

Yours very truly,

/s/ Charles H. Topping
Borough Manager

■ It is clear that if there were a prosecution pending against PNI pursuant to the challenged ordinance, in the absence of bad faith enforcement or other extraordinary circumstances, the principles of equity, comity, and federalism would preclude issuance of an injunction against the enforcement of the ordinance. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), as well as issuance of a declaratory judgment as to its constitutionality, Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688. These decisions were based upon an understanding that "a pending state proceeding, in all but unusual cases, would provide the federal plaintiff with the necessary vehicle for vindicating his constitutional rights", Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505, 515 (March 19, 1974).

The principles of equity, comity and federalism, however, have little application in the absence of a pending state proceeding, Steffel v. Thompson, *supra*, 94 S.Ct. 1209, 39 L.Ed.2d at 516, Lake Carriers' Assn. v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). As the Court noted in Steffel v. Thompson, *supra*, 94 S.Ct. at 1217, 39 L.Ed.2d at 516, "a refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of foregoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding."

■ Under the doctrine of Steffel v. Thompson, *supra*, a federal plaintiff may seek *declaratory* relief with respect to a challenged ordinance upon a showing that there exists an "actual controversy" within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.[5] As the Court noted, 94 S.Ct. at 1215, 29 L.Ed.2d at 514, 515 (footnote omitted):

At the threshold we must consider whether petitioner presents an "actual controversy," a requirement imposed by Art. III of the Constitution and the express terms of the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

Unlike three of the appellees in Younger v. Harris, 401 U.S., at 41, 91 S.Ct. 746, 27 L.Ed.2d 669, petitioner has alleged threats of prosecution that cannot be characterized as "imaginary or speculative," id., at 42, 91 S.Ct. at 749, 27 L.Ed.2d 669. He has been twice warned to stop handbilling that he claims is constitutionally protected and has been told by the police that, if he again handbills at the shopping center and disobeys a warning to stop, he will likely be prosecuted. The prosecution of petitioner's handbilling companion is ample demonstration that petitioner's concern with arrest has not been "chimerical," Poe v. Ullman, 367 U.S. 497, 508, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). In these cir-

---

4. Admitted as Exhibit P-37 at the hearing on July 15, 1974.

5. 28 U.S.C. § 2201 provides as follows:
"In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

cumstances, it is not necesary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights. See, e. g., Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L. Ed.2d 228 (1968). Moreover, petitioner's challenge is to those specific provisions of state law which have provided the basis for threats of criminal prosecution against him. Cf. Boyle v. Landry, 401 U.S. 77, 81, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Watson v. Buck, 313 U.S. 387, 399–400, 61 S.Ct. 962, 85 L.Ed. 1416, 136 A.L.R. 1426 (1941).

■■ In the instant case, it is obvious, in light of the letter of April 15, 1974, *supra,* that PNI has alleged threats of prosecution that cannot be characterized as "imaginary or speculative," and has identified with particularity those provisions of the law which have provided the basis for the threatened prosecution. In addition, there is no question about the *continuing* existence of a live and acute controversy between these parties, one that has not been made moot by the passage of time from the initiation of the action. Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).[6] Further, the fact that the ordinance is challenged *as applied to newspaper boxes,* rather than on its face, is not a bar to an action for a declaratory judgment, Steffel v. Thompson, *supra,* 94 S.Ct. 1209, 39 L.Ed.2d at 522–524, distinguishing Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). Under these circumstances, then, we hold that PNI need not expose itself to prosecution under the ordinance in order to test its constitutionality, but may proceed to seek a declaratory judgment in this Court with respect thereto.[7]

We turn now to the merits of the controversy.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, we make the following Findings of Fact with respect to the exhibits, stipulations, and testimony presented at the hearing on July 15 and 16, 1974:

#### FINDINGS OF FACT

1. Plaintiff Philadelphia Newspapers, Inc., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 400 N. Broad Street, Philadelphia, Pennsylvania.

2. Plaintiff publishes the Philadelphia Inquirer and the Philadelphia Daily News.

3. Defendants are the Borough Council, the Mayor, the Manager, and the Director of Public Works of the Borough of Swarthmore, Pennsylvania.

4. The Borough of Swarthmore is located in Delaware County, Pennsylvania, which is within the Eastern District of Pennsylvania.

5. The defendants are responsible for the enactment and enforcement of ordinances of the Borough of Swarthmore.

6. On March 8, 1971, the Council of the Borough of Swarthmore passed Ordinance #715, entitled "An Ordinance providing for free and unobstructed passage along the streets and sidewalks of the Borough, requiring trimming of hedges and other foliage encroaching thereon, establishing minimum overhead clearances, forbidding signs, stands or other obstructions, prohibiting commercial use thereof, permitting authorized public signs and barriers, and temporary construction work; providing penalties for violations."

---

6. In the absence of an order issued by this Court, it is the stated intention of the Borough to enforce the ordinance to exclude plaintiff's newspaper boxes from the streets of Swarthmore. Letter from counsel for the Borough to counsel for the plaintiff, dated July 11, 1974, and marked as Exhibit D–3 at the hearing on July 15, 1974.

7. Because of the disposition we make of this case, it is unnecessary to decide whether injunctive relief would likewise be available. See Steffel v. Thompson, *supra,* 94 S.Ct. 1209, 39 L.Ed.2d at 524.

7. On May 13, 1974, the Council of the Borough of Swarthmore passed a Resolution modifying Ordinance #715, and permitting "any tenant, owner or occupant of premises in the Business District of the Borough * * * to utilize not more than three feet of the public sidewalk adjoining his said premises for the orderly advertising and display of goods, wares and merchandise, and services and facilities available in or from said place of business", according to certain rules and regulations set forth in the Resolution.

8. A standard street in the Borough of Swarthmore consists of a paved roadway, 25 feet wide, with a sidewalk strip 12½ feet wide on either side. The sidewalk strip is that portion of a street or highway on either side of the roadway, normally consisting of the curb, the unpaved grass plot, the paved sidewalk, normally four feet wide, and the remaining unpaved space extending to the property line. The property line is the legal side line of a public street or highway.

9. A "newspaper box", as that term is used in these Findings of Fact, is 19 inches in width, 10 inches in depth, and, including the coin box, four feet in height.

10. During the first week in April, 1974, plaintiff placed two newspaper boxes at locations within the Borough of Swarthmore. Each of these boxes as on a public sidewalk strip, one on Rutgers Avenue in the vicinity of the Post Office, and the other on the southwest corner of the intersection of South Chester Road and Yale Avenue. These two boxes were the first and only such devices placed by plaintiff on the public sidewalks and along the public streets of the Borough.

11. On or about April 15, 1974, Charles H. Topping, Borough Manager of the Borough of Swarthmore, notified plaintiff that the newspaper boxes placed along public streets violated Ordinance #715, and ordered plaintiff to remove the boxes immediately.

12. This notification referred to a $300 fine for each violation of the ordinance.

13. On or about May 21, 1974, the two newspaper boxes were removed from their locations by the police department of the Borough of Swarthmore at the direction of the defendant Borough officials.

14. Thereafter, plaintiff protested to the Solicitor for the Borough of Swarthmore that the removal of the boxes from the two locations violated its right to distribute newspapers in public places and sought permission to replace them at said locations or at other mutually agreeable locations.

15. Defendant officials of the Borough of Swarthmore refused permission to place newspaper boxes at any locations along public streets or on public sidewalk strips within the Borough. It was the stated policy of the defendant officials to enforce Ordinance #715 so as to prohibit altogether any use of the public streets or sidewalks of the Borough by plaintiff for the placement of newspaper boxes, except as the placement of such boxes might be authorized by the Resolution of May 13, 1974. Defendant officials notified plaintiff that unauthorized newspaper boxes placed on sidewalk strips within the Borough would be removed.

16. On June 20, 1974, plaintiff filed the instant action in the United States District Court for the Eastern District of Pennsylvania, seeking declaratory and injunctive relief against enforcement of Ordinance #715, insofar as it prohibited the placement of newspaper boxes along streets and on sidewalks within the Borough of Swarthmore.

17. On June 21, 1974, after an initial hearing at which both parties were represented by counsel, this Court entered a temporary restraining order with respect to the two newspaper boxes which had been located at Rutgers Avenue near the Post Office, and at the intersection of Yale Avenue and South Chester Road. This order enjoined and

restrained defendants from continuing to prohibit or prevent plaintiff from placing newspaper boxes at these two locations. No relief was granted with respect to any other locations within the Borough of Swarthmore.

18. Pursuant to the temporary restraining order entered by this Court, the two newspaper boxes were returned to the locations at Rutgers Avenue near the Post Office, and at the intersection of Yale Avenue and South Chester Road.

19. By letter dated July 6, 1974, plaintiff, through its counsel, notified defendant officials, through their counsel, that PNI desired to place newspaper boxes at four additional public sidewalk locations within the Borough of Swarthmore. These additional locations were stated to be: (1) the northeast corner of Chester Road and Harvard Avenue; (2) the northeast corner of Chester Road and Westdale Avenue; (3) the southeast corner of College Avenue and Chester Road; and (4) the north side of Dartmouth Avenue at its intersection with Park Avenue. The letter further stated that plaintiff through its counsel would discuss these locations or any other locations with appropriate Borough officials.

20. By letter dated July 11, 1974, defendant officials, through their counsel, notified plaintiff's counsel, *inter alia,* that (1) the temporary restraining order of this Court applied only to the two boxes referred to therein; (2) it was the position of the Borough that Ordinance #715 prohibited the commercial use of public sidewalks, including the four additional locations proposed by plaintiff; (3) absent an order of this Court invalidating the Ordinance, it was the intention of the Borough officials to enforce the Ordinance according to its terms.

21. The daily circulation of the Philadelphia Inquirer is approximately 430,000 copies (net paid).

22. Of this 430,000 circulation, approximately 52% is by means of home delivery, and of the remaining 48%, the vast majority is by means of "single copy sales".

23. An average daily issue of the Inquirer has 54 pages; advertising accounts for approximately 45% of the total content of the newspaper.

24. Plaintiff as a matter of policy prefers to distribute the Inquirer through home delivery, since circulation by this means is assured each day. Many readers, however, for various reasons do not elect to take home delivery, and plaintiff must seek to reach these readers through single copy sales.

25. Newspaper boxes are a significant means of making single copy sales of the Inquirer.

26. Newspaper boxes have been in use in the Philadelphia area for more than thirty years.

27. Newspaper boxes are important to plaintiff for its single copy distribution for the following reasons: (1) newspapers sold by means of newspaper boxes are available at all hours of the day, including the early morning hours before local stores are open for business; this early morning distribution is particularly important for a morning newspaper such as the Inquirer; and (2) newspaper boxes provide outlets or points of distribution in addition to those provided by local stores; this is particularly important in suburban areas, where residences and business districts may be spread out over a considerable distance.

28. Of approximately 115,000 to 130,000 copies per day distributed directly by plaintiff through single copy sales (that is, without utilization of an intermediate distributor), more than 60,000, or approximately 50%, are distributed by means of newspaper boxes.

29. In the Borough of Swarthmore, approximately 700 copies of the daily Inquirer are distributed through home delivery, and in addition approximately 320 copies are distributed through single copy sales. The ratio of home deliveries to single copy sales has been fairly constant for the last three or four years.

30. The Philadelphia Inquirer may be purchased at three other locations within the business district of the Borough of Swarthmore: (1) the ticket window of the Penn Central Railroad Station, which opens on weekdays at 6:30 A.M.; (2) Michael's Drug Store, which opens on weekdays at 7:30 A.M.; (3) Nino's Drug Store, which opens on weekdays at 9:30 A.M. There is also a newspaper box on the platform of the railroad station, which is serviced on Saturdays only, when the ticket window is closed.

31. During the second and third weeks in May, 1974, before the two newspaper boxes on Swarthmore sidewalk strips were removed by the Borough police, the box at Chester Road and Yale Avenue sold about 15 copies per day, and the box at Rutgers Avenue near the Post Office sold 30 to 35 copies per day. At the time of the hearing on July 15 and 16, 1974, these sales figures were substantially lower, with as few as 5 or 6 copies per day being sold at the box at Chester Road and Yale Avenue. This decline in sales may be attributable to the normal "seasonal slump", which occurs during July and August, when many readers are on vacation, and to the increase in price from ten cents to fifteen cents per daily newspaper put into effect by the Philadelphia Inquirer within recent weeks.

32. A newspaper box is economically justifiable to the plaintiff if it regularly sells 5 to 10 copies per day. Sales of this magnitude would not support a newsboy or newsstand at a given location.

33. The single copy sales made by means of newspaper boxes in the Borough of Swarthmore have not affected the number of single copy sales made through other outlets.

34. The newspaper boxes in the Borough of Swarthmore are filled between 3:45 and 4:00 A.M. on weekdays. A significant number of copies are sold during the period from 5:45 to 7:00 A. M. During the second and third weeks of May, 1974, about 15 copies per day were sold prior to 7:00 A.M. at the box at Rutgers Avenue near the Post Office.

35. The first Penn Central commuter train leaves Swarthmore for downtown Philadelphia at 6:01 A.M. each weekday.

36. Copies of the Inquirer bound together in bundles, are left outside the train station between 3:45 and 4:00 A. M. on weekdays. Some purchasers take newspapers from these bundles before the ticket window opens at 6:30 A.M., leaving loose coins on the bundles. A similar practice occurs in front of Michael's Drug Store before it opens at 7:30 A.M. This procedure requires extraction of the newspapers from the tightly bound bundles; nor is there assurance of payment for newspapers taken in this manner.

37. The newspaper box in the vicinity of the Post Office is in the Business District of the Borough of Swarthmore. This newspaper box is secured by a chain to a traffic sign, but there is sufficient slack in the chain such that the box could be moved or rotated around the traffic sign. When placed in position by an employee of plaintiff, the box was facing away from the street and parallel to the curb. On occasion the box has been turned at an angle to the curb, in such a manner that the rear door of a small automobile might strike the box as the door was opened, even though the car was legally parked. There was no evidence, however, that this box had created any actual obstruction or injury to pedestrians or damage to automobiles in the Post Office vicinity. Plaintiff has agreed to relocate this box to the general vicinity of the Post Office if the Borough officials determine that its present location creates an obstruction.

38. The southwest corner of the intersection of South Chester Road and Yale Avenue is the location of the second newspaper box now in place as a result of the temporary restraining order entered by this Court. Located thereon, in addition to the newspaper box, are a

bench, signs, a mail box, and a traffic light. The nearest adjacent building is a medical office building, and on the northeast corner is a business structure formerly used as the place of business of an automobile dealer, with showroom and service facilities. Approximately one block from this intersection there is a large apartment complex, the Wildman Arms Apartments.

39. The newspaper box at the intersection of South Chester Road and Yale Avenue can be seen by motorists travelling on either roadway. South Chester Road is part of Route 320, and is 1.1 miles long within the Borough of Swarthmore. Between the hours of 7:00 A.M. and 9:00 A.M., and 4:00 P.M. and 6:00 P.M., traffic on South Chester Road at the above intersection is heavy. Parking on South Chester Road near this intersection is prohibited, since there is no shoulder on the roadway at this point. Parking on Yale Avenue is permitted, except within 25 feet of the intersection. The Borough police have experienced some traffic problems due to the placement of the newspaper box at this intersection. There has been some illegal parking by motorists who were getting newspapers, and the police have moved several motorists who have stopped on South Chester Road while making a purchase from the box. There is no indication that similar traffic problems have been caused by the location of the mail box at the same intersection. There is no evidence of any actual accidents or mishaps caused by the placement of the newspaper box at this intersection. Plaintiff has agreed to move the newspaper box from its present location to a location farther down Yale Avenue if its present placement creates a traffic hazard.

40. With respect to the existing locations and the proposed additional locations, plaintiff has agreed it would abide by defendants' decision as to placement so as to alleviate any interference with traffic, pedestrian or vehicular, and also has agreed to secure the boxes by means of weights placed within the boxes instead of chaining them to municipal standards, if the Borough so desires.

## DISCUSSION

Within the framework established by the above Findings of Fact, we now turn to a discussion of the legal issues presented by this litigation.

Defendants contend, in essence, that this case does not properly raise questions of freedom of the press under the First and Fourteenth Amendments, but involves instead the efforts of a quiet suburban town to control commercial activity within its boundaries. The principal arguments which defendants put forward are: *First,* that the ordinance is not directed against newspaper boxes *per se,* but seeks to prohibit "commercial use" and obstruction of the public streets and sidewalks; *second,* that plaintiff is a corporation organized for profit; *third,* that the Philadelphia Inquirer is sold rather than given away to the public, and that a typical daily copy thereof contains approximately 45% advertising; and, *fourth,* that advertising rates in a newspaper depend upon its circulation, and that an increase in circulation may permit an increase in advertising rates.

While we are sensitive to the commendable goals of the residents of the Borough to control what may be perceived as a pervasive commercialism in our cities that is rapidly encroaching upon pleasant and well-ordered suburban communities such as the Borough of Swarthmore, we cannot agree with the contention that a newspaper loses the protection of the First and Fourteenth Amendments merely because it is operated for profit, or forms part of a profit-making enterprise. Such a contention was considered and rejected by the Court in Wulp v. Corcoran, 454 F.2d 826 (1st Cir. 1972), a decision which invalidated an ordinance of the City of Cambridge, Massachusetts, establishing a li-

censing requirement for newspaper vendors on the city streets:

"  *   *   *  it can no longer be seriously contended that the mere fact that newspapers such as those which plaintiffs wish to distribute are offered for sale rather than distributed free of charge dilutes the protection otherwise afforded by the First Amendment. Whatever room for doubt there may once have been on this score was removed by Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). The Court in that case stated with respect to the First Amendment rights of a bookseller charged with violation of a state obscenity statute that '[i]t is of course no matter that the dissemination takes place under commercial auspices.' *Id.* at 150, 80 S.Ct. at 217. In New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court reaffirmed its allegiance to this view by giving full First Amendment protection to a newspaper which had accepted a paid advertisement alleged to be libelous. Cf. Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); Grosjean v. American Press Co., [297 U.S. 233, 56 S.Ct. 444, 880 L.Ed. 660 (1936)]. *See also* Note, Freedom of Expression in a Commercial Context, 78 Harv.L.R. 1191 (1965)." Wulp v. Corcoran, *supra,* 454 F.2d at 835, n. 13.

■   Indeed, historically, both before and after the adoption of the Constitution and the Bill of Rights, the norm in this country has been the sale of newspapers containing paid advertisements rather than free distribution; there is nothing to indicate that the words "freedom  *   *   *  of the press" in the First Amendment were intended to include only the "non-commercial" or not-

for-profit press. As the Supreme Court noted in Murdock v. Pennsylvania, 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943): "The right to use the press for expressing one's views is not to be measured by the protection afforded commercial handbills. It should be remembered that the pamphlets of Thomas Paine were not distributed free of charge." [8]

We conclude, therefore, that the protection of the First and Fourteenth Amendments is not to be denied to plaintiff merely because its newspaper operations can be described as "commercial".

■   Further, we are satisfied that the constitutional protection extends to *means* of distribution of the newspaper, as well as to its content and the ideas expressed therein. The Supreme Court has long held that the right to circulation is as essential to the freedom of the press as the right to publish; without circulation, freedom of publication is a mockery. Lovell v. Griffin, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938); Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877 (1878).

The precise issue in the instant case —the extent of constitutional protection afforded to newspaper boxes along public streets—has been considered in only two decisions known to this Court, each of which has concluded that newspaper boxes are a protected means of distribution. Although those cases dealt with ordinances which differed from the one before us and the factual situations are also distinguishable, nevertheless, the New York and California decisions striking down the restraints on distribution through the means of newspaper

---

8. Defendants are mistaken in their reliance on Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), which stands for the proposition that a municipality may regulate the distribution of commercial matter to which has been appended a "civic appeal, or a moral platitude", *id.* at 55, 62 S.Ct. at 922, where the clear intent of the distributor is to evade the prohibition of the ordinance. We cannot say that the Philadelphia Inquirer, which is 55% news and features, falls within the narrow limits of the decision in *Chrestensen.*

vending machines are persuasive even though not controlling.

Gannett Co. v. City of Rochester, 69 Misc.2d 619, 330 N.Y.S.2d 648 (S.Ct. Monroe County, 1972), involved an ordinance of the city of Rochester which required a permit in order to maintain or use any table, box, stand, newspaper vending machine or other structure for the sale, display or storage of newspapers, or magazines upon any sidewalk. An applicant for a permit was required to file proof of insurance, or proof of financial responsibility for self-insurance; this requirement could be waived if the applicant was unable to furnish such proof, and if the City Council concurred in the waiver. A permit application was required to be filed 10 days in advance in order to place a structure at a given location. The Commissioner of Public Works was empowered to determine if the proposed structure would interfere with the public's use of the right-of-way, or would block traffic or interfere with visibility at a given location. The Commissioner was also delegated authority to regulate the size, color, and appearance of the structure.

The Court in *Gannett* concluded that the Rochester ordinance was unconstitutional, on the following grounds: *First:* the ordinance was too broad, since it had the effect of restricting freedom of circulation of the press under the guise of preserving the right of free passage along the public sidewalks. By failing to directly attack the feared evil, viz., obstruction or unsafe conditions on public sidewalks, and by regulating instead an important means of newspaper distribution, the ordinance was "guilty of overkill similar to shooting down a fly with a cannon", 330 N.Y.S.2d at 653. *Second,* the standards set forth in the ordinance were unconstitutionally vague, invited equivocal interpretation, and had the effect of delegating to the Commissioner of Public Works the untrammeled power to grant or deny a permit; and, *third,* the 10 day waiting period prescribed in the ordinance could in some cases amount to an unconstitutional prior restraint on freedom of expression.

In Remer v. City of El Cajon, No. 344869 (Sup.Ct. San Diego Cty., Calif., filed April 24, 1974), the Court considered an ordinance of the City of El Cajon, California, which made it unlawful "for any person to place or maintain within, in, on, upon, or over any public parkway or sidewalk, any stand, rack, holder, vending machine, self-service stand, coin operated box, storage unit, or other device for the purpose of offering for sale, vending, distributing, or giving away, newspapers, periodicals, or other printed matter, or to authorize, cause or permit any such placement or maintenance." Judge Orfield concluded that the city ordinance was constitutionally defective because of its total prohibition of newsracks along public sidewalks:

"The First Amendment of the United States Constitution, as applied to the states by the Fourteenth Amendment, guarantees to these plaintiffs the right to distribute newspapers by means of newsracks or other vending devices placed upon the public sidewalks, but does not preclude the City of El Cajon from making reasonable regulations relating to the use of vending devices on sidewalks in the exercise of its police power." Remer v. City of El Cajon, *supra,* at p. 4 (slip opinion)

After careful consideration of the legitimate interests of all parties in the instant litigation, we must agree with the courts in *Gannett* and *Remer, supra,* that newspaper vending boxes or machines along public streets and sidewalks are a constitutionally protected means of distribution, and we conclude that the Ordinance of the Borough of Swarthmore is constitutionally defective and therefore void, insofar as it is applied to condition the placement of newspaper boxes on public sidewalk strips within the Borough upon compliance with the totally uncertain and unsatisfactory provisions of the ordinance as modified by the resolution.

The Supreme Court has long recognized the importance of the right of access to the public streets for free dissemination of information.[8] Many subsequent decisions have quoted the words of Mr. Justice Roberts in Hague v. CIO, 307 U.S. 496, 515–516, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939):

Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

The right of access to the streets includes not only the right to speak freely, but the related right to distribute printed material. Flower v. United States, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). It also includes techniques of dissemination which were unknown to the drafters of the Bill of Rights, when such techniques are shown to be important means of public communication; Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948) (municipality cannot require police permission before permitting use of sound trucks within city).

In assessing the constitutionality of any attempted regulation of the right of access to the public streets and sidewalks, a Court must balance the diverse legitimate interests of the municipality under its police power against the preferred status of rights guaranteed by the First and Fourteenth Amendments. Saia v. New York, *supra*, 334 U.S. at 562, 68 S.Ct. 1148. In particular, the attempted regulation must be closely scrutinized to determine if the feared evil which was the object of the enactment could be attacked by a more narrowly drawn provision, which would less severely restrict freedom of expression and at the same time accommodate the proper interest of the municipality in promoting the welfare of its citizens. These are not easy problems to resolve. The Borough argues with much force and is supported by sincere citizens who testified in court about their apprehensions in opening the floodgates to commercialism and thus changing the char-

8. For this reason, defendants' contention that the Philadelphia Inquirer is available from other sources within the Borough is, from a constitutional standpoint, irrelevant. Each of these alternative sources of distribution—the two drug stores, the ticket window at the train station, a newspaper box on the platform of the train station, and an independent contractor who makes home delivery—is within the control of private parties and involves utilization of private property. Similarly, the possibility that the two drug stores might choose to invoke the Resolution of May 13, 1974, in order to place newspaper boxes in front of their places of business cannot save the ordinance, since it is clear that such placement is solely within the discretion and control of the store owners.

Defendants cannot seriously contend that access to the public streets and sidewalks for purposes of expression of ideas could be prohibited on the ground that such ideas could equally well be expressed on private property. As the Supreme Court noted in Schneider v. State, *infra*, 308 U.S. 147 at 163, 60 S.Ct. at 151, "streets are natural and proper places for the dissemination of information and opinion". The cases which have upheld prohibition of access or expression in a given location because of the existence of other available locations, see e. g., Hamer v. Musselwhite, 376 F.2d 479 (5th Cir. 1967), have based their decisions on the availability of an alternate *public* forum, not on the possibility that someone would make private property available for the purpose.

acter of the community in which they have justifiable pride. That is indeed a commendable concern. But against the desire to keep public sidewalks free of these boxes must be balanced not only the right of the plaintiff to distribute its newspapers, but the right of the public to have access that is as free as possible as long as the means of distribution do not create *real* hazards for the wellbeing of the citizens of the Borough in contrast to those hazards which are hypothesized, albeit, earnestly and sincerely feared. As the Court noted in Saia v. New York, *supra*, 334 U.S. at 562, 68 S.Ct. at 1150:

> The present ordinance would be a dangerous weapon if it were allowed to get a hold on our public life. Noise can be regulated by regulating decibels. The hours and place of public discussion can be controlled. But to allow the police to bar the use of loud-speakers because their use can be abused is like barring radio receivers because they too make a noise. The police need not be given the power to deny a man the use of his radio in order to protect a neighbor against sleepless nights. The same is true here.

> Any abuses which loud-speakers create can be controlled by narrowly drawn statutes. * * *

Indeed, the Supreme Court has frequently upheld reasonable "time, place, and manner" regulations, as long as they are narrowly drawn and applied in an even-handed manner. See e. g., Grayned v. City of Rockford, 408 U.S. 104, 92 S. Ct. 2294, 33 L.Ed.2d 222 (1972) (upholding an antinoise ordinance which prohibited any person while on grounds adjacent to a school from wilfully making a noise or diversion which disturbs or tends to disturb the peace or good order of the school session); Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968) (upholding a statute prohibiting picketing so as to obstruct or unreasonably interfere with entry and exit of county courthouse); Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (upholding prohibition of picketing in or near a courthouse with the intent of interfering with, obstructing, or impeding the administration of justice); Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L. Ed. 1049 (1941) (upholding a licensing system construed to allow reasonable time, place, and manner restrictions on public parades and processions).

The ordinance in question in the instant case, however, is applied so as to prohibit plaintiff from distributing newspapers by means of newspaper boxes. In fact, the ordinance on its face *might prohibit newsboys* as well as newspaper boxes, since it prohibits "any commercial use" of the streets of the Borough.[9] As such, it is constitutionally defective.[10] Further, the modifying provisions of the resolution cannot save the ordinance as applied to plaintiff. To condition distribution by means of newspaper boxes on proprietorship of the adjacent store casts an economic burden on the newspaper publisher that is a clear impediment to unobstructed distribution. As noted, it is clearly unreasonable to say that the right to have the box displayed must depend upon the discretion of the merchant and, at that, only a merchant who sells newspapers from his

---

9. Defendants have disclaimed any intention to apply the ordinance to newsboys. Hearing on Temporary Restraining Order, June 1, 1974 (N.T. 42). Nonetheless, the ordinance by its terms refers to "commercial use" of the streets of the Borough, and it is difficult to understand why newspapers sold by means of newspaper boxes are "commercial", while the same newspapers sold by means of a human instrumentality are not "commercial".

10. The fact that the ordinance is not specifically directed at curtailment of newspaper distribution is immaterial. The crucial fact from the standpoint of the First and Fourteenth Amendments is that, as applied, the ordinance has the *effect* of impermissibly restricting distribution of newspapers. Flower v. United States, *supra*.

own establishment as part of his regular business. Similarly, to say that even this mode of distribution must be limited to the business district, admittedly a small area within the Borough, and during only those hours when the particular store is open for business, would completely negate the underlying economic and factual basis of plaintiff's utilization of this type of newspaper distribution. Clearly, plaintiff is employing this means of distribution because changing conditions, circumstances and patterns of population among other reasons dictate changing modes of circulation.

We do not mean to imply that the Borough is unable to regulate the use of newspaper boxes on its sidewalks. As Judge Orfield noted in *Remer, supra* at 4, our decision does not preclude the Borough from "making reasonable regulations relating to the use of vending devices on sidewalks in the exercise of its police power". In particular, if the feared evil is obstruction of the sidewalks that will interfere with the public's right to unhampered passage thereon, narrow regulations as to the size and location of newspaper boxes could be formulated which would certainly survive constitutional scrutiny. See e. g. Wolin v. Port of New York Auth., 392 F.2d 83 (2d Cir. 1968). If the feared evil is traffic congestion or illegal parking or stopping by motorists in order to purchase newspapers, narrow regulations with respect to the location of newspaper boxes in relation to the character of the roadway could also be formulated.[11]

If destruction or damage to municipal property because of chaining newspaper boxes to traffic standards or other fixtures is feared, suitable prohibitions could be enacted which would have only an incidental restrictive effect upon distribution by means of newspaper boxes.[12] Finally, aesthetic considerations could justify the promulgation of reasonable regulations as to the size and appearance of the boxes, and the type and format of permissible identification or advertising.

Regulations of such character fall well within the permissible bounds of the police power of a municipality.[13] The fatal flaw in the ordinance and resolution as applied to plaintiff is the unreasonably restrictive and hence impermissible means to achieve permissible ends. As the Supreme Court noted in NAACP v. Alabama, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325 (1964), "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms".

For these reasons, we will grant declaratory relief adjudging Ordinance # 715 and the Resolution of May 13, 1974, invalid as they are applied, either, *first*, to totally prohibit the placement of newspaper boxes on the sidewalk strips within the Borough of Swarthmore, or, *second,* to condition placement upon compliance with the terms of the above resolution. We de-

11. We do not mean to suggest, however, that a purported traffic problem could be used to justify prohibiting newspaper boxes along any roadway, without regard to the existence of parking facilities, an adequate shoulder, etc. *See* Young v. Sacramento Mun. Dist., County of Sacramento, 16 Cal. App.3d 766, 94 Cal.Rptr. 331 (1971). The normal means to control traffic flow is through the use of traffic regulations.

12. Plaintiff has indicated a willingness to cease the practice of chaining newspaper boxes to municipal fixtures. An alternate method of securing the boxes is through the use of concrete blocks concealed within the boxes.

13. Moreover, we are specifically limiting our holding to the constitutionality of the challenged Ordinance and Resolution as applied to the distribution of newspapers because of the special protection accorded under the First and Fourteenth Amendments. We are not passing upon the validity of the Ordinance as it relates to commercial activity that does not come within the orbit of those Amendments.

cline, however, to grant the requested injunctive relief. Throughout these proceedings, defendants and their counsel have demonstrated the utmost good faith and candor with the Court. We have every reason to believe that they will accept this Court's final determination as to the constitutionality of the ordinance as applied, and that they will abide by the terms of the declaratory judgment herein entered, until such time, if ever, as it is modified, vacated, or set aside by this Court or by the Court of Appeals for the Third Circuit or the Supreme Court of the United States. Wulp v. Corcoran, *supra*, 454 F.2d at 835; Strasser v. Doorley, 432 F.2d 567, 570 (1st Cir. 1970). Either party, however, may petition this Court for injunctive relief should circumstances justify such an application.

The above shall constitute Conclusions of Law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

A declaratory judgment accordingly will be entered in form attached hereto, the effective date of the judgment to be the date set forth therein.

### DECLARATORY JUDGMENT

And now, to wit, this 13th day of August, 1974, pursuant to Rule 57 of the Federal Rules of Civil Procedure, and Section 2201 of Title 28 of the United States Code, it is hereby declared and adjudged that Ordinance No. 715 of the Borough of Swarthmore, Pennsylvania, enacted by the Council of the Borough of Swarthmore on March 8, 1971, and the Resolution of the Council of the Borough of Swarthmore, passed on May 13, 1974, are unconstitutional and void, insofar as:

FIRST: They are applied to prohibit the placement of newspaper boxes anywhere on the public sidewalk strips within the Borough of Swarthmore, or

SECOND: they are applied to limit the placement of newspaper boxes to a three foot strip of the public sidewalk adjacent to premises within the business district of the Borough of Swarthmore,

during business hours, when such newspaper boxes have been so placed by the tenant, owner or occupant of a business establishment which customarily sells newspapers.