PROVIDENCE JOURNAL COMPANY, the Edward A. Sherman Publishing Company, the New York Times Company, Dow Jones & Company, and Gannett Satellite Information Network, Inc.

v.

CITY OF NEWPORT.

Civ. A. No. 86–0320–P.

United States District Court, D. Rhode Island.

June 12, 1987.

John H. Blish and Joseph V. Cavanagh, Jr., Providence, R.I., for plaintiffs.

MaryJo Carr and Joseph J. Nicholson, Jr., City Solicitor's Office, City of Newport, Newport, R.I., for defendant.

## OPINION AND ORDER

PETTINE, Senior District Judge.

The question presented by this case is whether a municipality may ban the placement of coin-operated newspaper vending machines, known as newsracks, upon its public rights of way. The plaintiffs, five newspaper publishers, have brought suit under 42 U.S.C. sections 1983 and 1988 seeking declaratory and injunctive relief against the city of Newport, Rhode Island, which recently enacted such a ban. The jurisdiction of the court is invoked pursuant to 28 U.S.C. sections 1331 (federal question) and 1343 (civil rights).

Presently before the court are the plaintiffs' motion for summary judgment and the defendant's cross-motion for summary judgment. For reasons discussed herein, I am granting summary judgment in favor of the plaintiffs.

## I. FACTUAL BACKGROUND

Each of the five plaintiffs in this case publishes a daily newspaper that is distributed in the city of Newport, Rhode Island. The Providence Journal Co., a Rhode Island corporation, publishes each weekday morning and evening the Providence Journal and the Evening Bulletin; it also publishes the Journal Bulletin on Saturday and the Providence Sunday Journal on Sundays. The Edward A. Sherman Publishing Co., a Rhode Island corporation, publishes the Newport Daily News Monday through Saturday. The New York Times Co., a New York corporation, publishes the New York Times seven days a week. Gannett Satellite Information Network, Inc., a Delaware corporation, publishes USA Today Monday through Friday. Dow Jones & Co., Inc., a Delaware corporation, publishes the Wall Street Journal Monday through Friday. The defendant in this case, the city of Newport, is a public municipal corporation organized and existing under the laws of the state of Rhode Island.

Prior to March, 1986 the city of Newport allowed newsracks to be placed on public rights of way adjacent to buildings, vacant lots and street curbs, subject to various location, size, insurance and permit fee regulations. *See* Codified Ordinances of the City of Newport, Revision of 1980, Chapter 842, "Newspaper Vending Devices."[1] On or about March 26, 1986 the Newport City Council enacted the following amendment to Chapter 842:

Chapter 842.02 "Location"

No newsrack shall be permitted on any public right of way within the City of Newport.

SECTION 2. This ordinance shall take effect June 1, 1986 and all ordinances or parts of ordinances inconsistent herewith are hereby repealed.

By letter dated May 16, 1986 the city of Newport notified several of the plaintiffs of its intention to enforce the foregoing ordinance and directed the plaintiffs to remove their respective newsracks from all public rights of way in the city by May 31, 1986. On May 29, 1986 the plaintiffs filed the instant action for declaratory and injunctive relief. A temporary restraining order was entered by this court on May 29, 1986, restraining the city of Newport from

---

1. Exhibit A attached to plaintiffs' reply memorandum in support of plaintiffs' motion for summary judgment.

enforcing the challenged ordinance until further order of the court.

According to discovery undertaken by the defendant, the plaintiffs' newspapers are distributed throughout the city of Newport not only by newsracks on public rights of way, which would be banned by the ordinance, but also via newsracks on private property and retail establishments such as stores and newsstands, none of which would be affected by the ordinance. The precise figures obtained through discovery are as follows: outlets for the Providence Journal Co.'s newspapers include eight newsracks on public rights of way, seventeen newsracks on private property and forty-four retail establishments; outlets for the Newport Daily News include ten newsracks on public rights of way, eleven newsracks on private property and forty-three retail establishments; outlets for USA Today include ten newsracks on public rights of way, ten newsracks on private property and fifteen retail establishments; outlets for the New York Times include eleven newsracks on public rights of way, eleven newsracks on private property and an unknown number of retail establishments. Precise figures regarding the Wall Street Journal were not made available by Dow, Jones & Co., Inc.

## II. DISCUSSION

To grant a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the court must first find that there is no genuine issue of material fact, looking at the record and drawing all inferences in the light most favorable to the party opposing the motion. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). If no material facts are in dispute, then summary judgment can be granted if the court further finds that the moving party is entitled to judgment as a matter of law, viewing the evidence in the light most favorable to the opposing party. *Cia. Petrolera Caribe, Inc. v. ARCO Caribbean, Inc.*, 754 F.2d 404, 411 (1st Cir.1985); *Irish Subcommittee v. Rhode Island Heritage Commission*, 646 F.Supp. 347, 351 (D.R.I.1986).

In this case, with the above recited facts undisputed, the parties' motions for summary judgment turn solely on principles of First Amendment law. The First Amendment to the Constitution provides in pertinent part, "[c]ongress shall make no law ... abridging the freedom of speech, or of the press...." Through the due process clause of the Fourteenth Amendment, the strictures of the First Amendment apply with equal force to limit state action. *Lovell v. City of Griffin*, 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1938); *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925). Because municipal legislation is a recognized category of state action, *Lovell*, 303 U.S. at 450, 58 S.Ct. at 668, the newsrack ban enacted by the city of Newport is subject to the First Amendment's proscriptions against state regulation of expressive activity.

A three-step inquiry must be undertaken to determine whether the challenged ordinance violates the proscriptions of the First Amendment: first, assessing whether the object of the challenged ordinance constitutes activity protected by the First Amendment; second, if protected activity is found, characterizing the particular forum in which the protected activity has been or is being attempted; and third, evaluating the state's proffered justifications for the challenged ordinance under the First Amendment standards applicable to the particular forum. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 105 S.Ct. 3439, 3446–47, 87 L.Ed.2d 567 (1985); *Irish Subcommittee v. Rhode Island Heritage Commission*, 646 F.Supp. 347, 352 (D.R.I.1986).

### A. *Protected Activity*

The challenged ordinance prohibits, on all public rights of way, the distribution of newspapers via newspaper vending machines, commonly known as newsracks. It has long been established that the First Amendment's guarantee of a free press necessarily protects the right to distribute newspapers. "Liberty of circulating is as

essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value." *In re Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877, 879 (1878); *see also Talley v. State of California,* 362 U.S. 60, 64, 80 S.Ct. 536, 538, 4 L.Ed.2d 559 (1960); *Lovell v. City of Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938); *Gannett Satellite Information Network v. Town of Norwood,* 579 F.Supp. 108, 114 (D.Mass.1984); *Rubin v. City of Berwyn,* 553 F.Supp. 476, 479 (N.D. Ill.), *aff'd.* 698 F.2d 1227 (7th Cir.1982); *Miller Newspapers, Inc. v. City of Keene,* 546 F.Supp. 831, 833 (D.N.H.1982). The protection accorded liberty of circulation is grounded not only in the newspaper's right of publication, but also in the public's right of access to newspapers. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 576, 100 S.Ct. 2814, 2827, 65 L.Ed.2d 973 (1980); *Philadelphia Newspapers, Inc. v. Borough of Swarthmore,* 381 F.Supp. 228, 243 (E.D.Pa.1974) (The state's interests "must be balanced [against] not only the right of the plaintiff to distribute its newspapers, but the right of the public to have access that is as free as possible as long as the means of distribution do not create *real* hazards...." (emphasis in original)). As one court has observed, the right to receive information is "the indispensable reciprocal of any meaningful right of expression." *Sheck v. Bailyville School Committee,* 530 F.Supp. 679, 685 (D.Me. 1982). *See also Board of Education, Island Trees Union Free School District No. 26 v. Pico,* 457 U.S. 853–54, 102 S.Ct. 2799, 2808, 73 L.Ed.2d 435 (1982); *Virginia State Board of Pharmacy v. Citizens' Consumer Council, Inc.,* 425 U.S. 748, 756–57, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976).

▆ The reciprocal liberties of circulation and of access are protected by the First Amendment irrespective of whether the newspapers are to be distributed for free or for a fee. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 504 n. 11, 101 S.Ct. 2882, 2890 n. 11, 69 L.Ed.2d 800 (1981); *Smith v. California,* 361 U.S. 147, 150, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959); *Gannett Satellite Information Network v. Metropolitan Transit Authority,* 745 F.2d 767, 772 (2d Cir.1984); *Wulp v. Corcoran,* 454 F.2d 826, 834–35 n. 13 (1st Cir.1972); *Gannett Satellite Information Network v. Town of Norwood,* 579 F.Supp. 108, 114 (D.Mass.1984). Based on these considerations, I readily join the long line of precedents holding that coin-operated newspaper vending machines constitute a means of distributing newspapers that is entitled to full First Amendment protection. *See Plain Dealer Publishing Co. v. City of Lakewood,* 794 F.2d 1139, 1143 (6th Cir. 1986), *prob. juris. noted,* —— U.S. ——, 107 S.Ct. 1345–46, 94 L.Ed.2d 517 (1987); *Gannett Satellite Information Network v. Metropolitan Transit Authority,* 745 F.2d 767, 772 (2d Cir.1984); *Miami Herald Publishing Co. v. City of Hallandale,* 734 F.2d 666, 673 (11th Cir.1984); *Gannett Satellite Information Co. v. Town of Norwood,* 579 F.Supp. 108, 114 (D.Mass.1984); *Miller Newspapers, Inc. v. City of Keene,* 546 F.Supp. 831, 834 (D.N.H.1982); *Southern New Jersey Newspapers, Inc. v. New Jersey Dept. of Transportation,* 542 F.Supp. 173, 183 (D.N.J.1982); *Philadelphia Newspapers, Inc. v. Borough of Swarthmore,* 381 F.Supp. 228, 241 (E.D.Pa.1974); *News Printing Co. v. Borough of Totowa,* 211 N.J.Super. 121, 511 A.2d 139, 143 (1986).

## B. *Characterizing the Forum*

The degree to which the government may regulate communicative activity protected by the First Amendment depends upon the nature of the forum in which the First Amendment rights are sought to be exercised. *Cornelius v. NAACP Legal Defense and Educational Fund,* 473 U.S. 788, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985); *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). For purposes of First Amendment analysis, three types of fora are recognized: "the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius,* 105 S.Ct. at 3449.

The traditional public forum includes places such as streets and parks, which "by

long tradition or by government fiat have long been devoted to assembly or debate," *Perry*, 460 U.S. at 45, 103 S.Ct. at 954; *see also Hague v. CIO*, 307 U.S. 496, 515–16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). In these traditional public fora, "the rights of the state to limit expressive activity are sharply circumscribed." *Perry*, 460 U.S. at 45, 103 S.Ct. at 954. The public forum created by government designation consists of public property that the state has opened for expressive activity, such as university meeting facilities, *see Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), school board meetings, *see City of Madison Joint School District v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976), and municipal theaters, *see Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *see generally, Perry*, 460 U.S. at 45–46, 103 S.Ct. at 955. "Although a State is not required to indefinitely retain the open character of [such a] facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Id.* The nonpublic forum consists of "public property which is not by tradition or design a forum for public communication," *id.*, and includes such communicative channels as government-sponsored charity solicitations in government workplaces, *see Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), and the internal mail systems of public schools, *see Perry*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The nonpublic forum may be reserved by the state "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view," *id.*, 460 U.S. at 46, 103 S.Ct. at 955.

In this case, the challenged ordinance bars the placement of newsracks "on any public right of way within the City of Newport." For purposes of newsrack regulation, the city of Newport defines a "public right of way" as "any public street, highway, sidewalk, parkway or alley," *see* Codified Ordinances of the City of Newport, Revision of 1980, Chapter 842, "Newspaper Vending Devices," section 842.01(b).[2] By its terms, the prohibition at issue is directed at protected First Amendment activity taking place entirely within a traditional public forum. "Traditional public forum property occupies a special position in terms of First Amendment protection," *United States v. Grace*, 461 U.S. 171, 180, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983), such that the challenged ordinance faces an "especially heavy" burden of justification, *Southern New Jersey Newspapers, Inc. v. New Jersey Dept. of Transportation*, 542 F.Supp. 173, 185 (D.N.J.1982).

## C. *Evaluating the Regulation*

■ In a public forum, the state may not prohibit all communicative activity, *Perry*, 460 U.S. at 45, 103 S.Ct. at 955, but it may regulate communicative activity in accordance with either of two sets of criteria. On the one hand, communicative activity may be regulated based upon its content, but only if the state can show that such a regulation "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.; see also Carey v. Brown*, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980), and cases cited therein. Alternatively, the state may regulate the time, place and manner of communicative activity in a public forum, provided the state can show that the regulation is content-neutral, is narrowly tailored to serve a significant government interest and leaves open ample alternative channels of communication. *See Perry*, 460 U.S. at 45, 103 S.Ct. at 955, and cases cited therein.

■ These principles require the court initially to determine whether the state's regulation of communicative activity constitutes a total prohibition, which is per se unconstitutional in the public forum, or

---

**2.** Exhibit A attached to plaintiffs' reply memorandum in support of plaintiffs' motion for summary judgment.

whether it imposes a more selective limitation, which would merit further review under either of the aforementioned sets of criteria. Since the city of Newport has totally banned newsracks from its public rights of way, the question of totality versus selectivity turns on whether newsracks can be deemed an all-inclusive class of communicative activity by themselves, or whether they constitute one sub-class of some more broadly defined species of communicative activity. Upon reflection, I find the latter view more persuasive than the former. For purposes of First Amendment analysis, newsracks are functionally indistinguishable from newsstands and newsboys: all three serve as conduits for the distribution of newspapers in public spaces. Accordingly, I find that the city of Newport's prohibition of newsracks from its public rights of way cannot be deemed a total prohibition of communicative activity in a public forum, and hence cannot be ruled per se unconstitutional.[3] Cf. Philadelphia Newspapers, Inc. v. Borough of Swarthmore, 381 F.Supp. 228, 243 nn. 9–10 and accompanying text (E.D.Pa.1974) (finding unconstitutional, without reaching time/place/manner inquiry, an "ordinance [that] on its face might prohibit newsboys as well as newspaper boxes," thus "impermissibly restricting the distribution of newspapers." (citation omitted)).

Having found that the city of Newport has not totally banned the distribution of newspapers from its public rights of way, the court must next determine which set of criteria govern its review of the challenged ordinance. This determination turns on whether the newsrack ban is a content-based restriction of communicative activity, or whether it is a content-neutral time, place and manner regulation of such activity. Since the ban applies equally to all newsracks regardless of whose newspaper is carried inside and irrespective of the content of the particular newspaper, the ordinance is clearly content-neutral. See Plain Dealer Publishing Co. v. City of Lakewood, 794 F.2d 1139, 1147 (6th Cir. 1986); Gannett Satellite Information Network v. Metropolitan Transit Authority, 754 F.2d 767, 773 (2d Cir.1984); Miami Herald Publishing Co. v. City of Hallandale, 734 F.2d 666, 673–74 (11th Cir.1984). As such, the ordinance may be reviewed under the criteria governing time, place and manner regulations of communicative activity. In addition to content neutrality, these criteria require proof of the following: (1) that the ordinance serves a significant government interest; (2) that the ordinance is narrowly tailored to serve that purpose; and (3) that the ordinance leaves open ample alternative channels of communication. See United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983); Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

## 1. Significant government interest

The city of Newport has advanced two government interests to justify the newsrack ban. First, a safety rationale is asserted, encompassing both the flow of pedestrian traffic on sidewalks, especially during tourist season, and the flow of ve-

---

**3.** Focusing on the smallest general class of communicative activity (the distribution of newspapers) rather than the specific means of carrying it out (newsracks, newsstands, etc.) is relevant only in deciding whether the state has totally or selectively banned communicative activity in the public forum. This analytical framework should not be transposed onto the separate and prior inquiry into the scope and character of the forum.

In the latter inquiry, the different means of carrying out the same communicative activity may have legal significance. For example, if a state fair is held on public parkland, the subdivision of the parkland into separate booths leaves intact the public character of the parkland on which the booths rest, and thus creates a number of little public fora subject to the same First Amendment rules as the unenclosed areas of the park. See Irish Subcommittee v. Rhode Island Heritage Commission, 646 F.Supp. 347, 352–53 (D.R.I.1986). In this situation, the state may not exclude certain groups from the use of booths, leaving them to roam the open fairground, by arguing that such groups could perform the same communicative activity on the fairgrounds, e.g. leafleting, as they desire to perform from the booths. Id.

hicular traffic near curbsides.[4] As to the latter, the city contends that newsracks chained to utility poles are "prone to creeping out over the curbside and thus being struck by oncoming vehicles," and that one time "a newsrack was struck by a bus as it travelled down Bellevue Avenue in Newport."[5] Second, the city asserts an aesthetic interest, based upon a submission of photographs allegedly depicting "the banged up, poorly maintained [and] rust infested condition" of the newsracks,[6] and upon an affidavit by the City Manager characterizing the newsracks as "visual blight ... which unreasonably detract from the aesthetics of the City of Newport."[7]

The city's burden here is twofold: to raise a significant government interest, and to show that the ordinance in question advances the asserted interest. As to the first of these burdens, both safety, *see Heffron v. International Society for Krishna Consciousness (ISKON)*, 452 U.S. 640, 650, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981); *Cox v. State of New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941), and aesthetics, *see Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 806–807, 104 S.Ct. 2118, 2129–2130, 80 L.Ed.2d 772 (1984); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–508, 101 S.Ct. 2882, 2892–93, 69 L.Ed.2d 800 (1981) (plurality opinion), are now broadly recognized as significant government interests.

Whether the ordinance has been shown to advance these interests, however, remains a more equivocal matter. Of the assorted safety interests, pedestrian traffic flow is the one most clearly advanced by the ordinance. Some of the photographs submitted show up to half the width of a sidewalk obstructed by three or four adjacent newsracks.[8] At such locations, any sizable flow of tourists[9] would encounter pedestrian bottlenecks and very likely spill over into the street, creating significant safety hazards for themselves and for drivers. Handicapped pedestrians would be particularly disadvantaged by the loss of sidewalk space at these newsrack clusters. By clearing the sidewalks of all newsracks the ordinance clearly advances the city's safety interest in unobstructed pedestrian traffic flow.

The safety interest in unobstructed vehicular traffic flow is not so clearly advanced by the ordinance, however. The city of Newport has provided no explanation of the alleged tendency of newsracks to "creep" over curbsides into the streets. The city submitted sixteen photographs depicting forty newsracks on public rights of way. Of this total, only one newsrack is shown to be protruding over a curbside; the protrusion appears to be in the range of one or two inches; and the pavement over which it protrudes appears to be part of a parking area, not a street.[10] The newsrack claimed to have been struck by an oncoming bus is depicted in a photograph of three newsracks chained to a utility pole at a yellow-painted curbside, presumably a bus stop.[11] None of the three newsracks protrudes into the street. Nor have the circumstances of the alleged collision been explained, either in the city's memorandum of law or in the affidavit of the city official claiming knowledge of the collision.[12] I therefore conclude that the

4. Defendant's memorandum in support of cross-motion for summary judgment ("Defendant's memorandum") at 4.

5. *Id.*

6. *Id.* at 3 and exhibits 1–4.

7. Defendant's exhibit A.

8. *See* defendant's exhibit 4.

9. The court takes judicial notice of the fact that the city of Newport is one of Rhode Island's leading seaside resorts, frequented by many tourists during the summer. *See* Fed.R.Evid. 201(b)(1); *cf. Farmland Preservation Ass'n v. Goldschmidt*, 611 F.2d 233, 237 (8th Cir.1979) (taking judicial notice of the fact that certain property within the jurisdiction consists of extremely valuable farm lands).

10. *See* defendant's exhibit 3.

11. *See* defendant's exhibit 2.

12. *See* affidavit of Edward Williams, Zoning Inspector, ¶ 4, defendant's exhibit B.

only conceivable interference with vehicular traffic flow caused by newsracks derives from the aforementioned obstructions of pedestrian traffic flow, insofar as the latter causes pedestrians to walk in the streets where newsracks are inconveniently clustered.

The city's aesthetic interests are the ones least clearly advanced by the ordinance. To buttress its claim that the newsracks are eyesores, the city has described them as "banged up, poorly maintained [and] rust-infested." [13] Yet of the forty newsracks depicted in the city's photographic exhibits, none appear rust-infested, all but one have well-maintained exterior graphics and paint jobs,[14] and only five appear to have any dents, only one of which appears readily noticeable to the casual observer.[15] Contrary to the city's description, the newsracks depicted by the city's exhibits are generally very well maintained, such that the particular condition of the newsracks cannot by itself be found to infringe the city's aesthetic interests.

Giving the city the benefit of the doubt, however, the argument is not just that most newsracks have deteriorated, but that even well-maintained newsracks are eyesores: as the City Manager stated, the ordinance was intended to accomplish, *inter alia*, the "removal of visual blight from the public rights-of-way which unreasonably detract from the aesthetics of the City of Newport." [16] But although some individuals might view newsracks as eyesores, the question for the court is whether their elimination from the streets of Newport "would have more than a negligible impact on aesthetics," *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 530–31, 101 S.Ct. 2882, 2904, 69 L.Ed.2d 800 (1981) (Brennan, J., concurring). Courts have long recognized that aesthetics is not so much a mat-

ter of absolute standards as it is a function of context. *Cf. Federal Communications Commission v. Pacifica Foundation*, 438 U.S. 726, 742, 98 S.Ct. 3026, 3037, 57 L.Ed.2d 1073 (1978) ("[I]ndecency is largely a function of context—it cannot be judged in the abstract."); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926) ("[T]he question whether a particular thing is a nuisance, is to be determined not by abstract consideration ... but by considering it in connection with the circumstances and the locality. A nuisance may be merely a right thing in the wrong place, like a pig in the parlor instead of the barnyard."). Accordingly, the aesthetic impact of particular additions to a local environment will vary depending upon both the kind and amount of existing artificial encroachments upon the environment. As I have previously observed, in reviewing a state's prohibition of billboards on public highways:

> Even assuming that a total ban ... will produce some aesthetic gain in all highway areas, the quantum of improvement will obviously vary with the site involved. In undeveloped areas, it may very well be that signs and billboards are the principal eyesores; here, the benefits will be great, for their removal would return the landscape to its pristine beauty. In industrial and commercial areas, however, signs and billboards are but one of countless types of manmade intrusions on the natural landscape.

*John Donnelly & Sons v. Campbell*, 639 F.2d 6, 23 (1st Cir.1980) (concurring opinion), *aff'd.*, 453 U.S. 916, 101 S.Ct. 3151, 69 L.Ed.2d 999, *quoted in Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 531 n. 8, 101 S.Ct. 2882, 2904 n. 8, 69 L.Ed.2d 800 (1981) (Brennan J., concurring).

13. Defendant's memorandum at 3.

14. One side of one USA Today newsrack displays what appears to be a ripped portion of a paste-on USA Today logo and a half-painted-over portion of a complete USA Today logo. *See* defendant's exhibit 3.

15. Moderate-sized dents appear in one USA Today newsrack, one Boston Herald newsrack, one Boston Globe newsrack and one New York Times newsrack, *see* defendant's exhibit 1, p. 1. Large, highly visible dents appear in one New York Times newsrack, *see* defendant's exhibit 1, p. 2.

16. Affidavit of Francis C. Edwards, City Manager, ¶ 3, d, defendant's exhibit A.

Of the forty newsracks depicted in the city's photographic exhibits, all are located along paved sidewalks that abut streets or parking lots, and all but one are chained to either a metal lamppost, a wooden telephone pole or a metal signpost. In three of the sixteen photographs, trash barrels or dumpsters are located within a few yards of the newsracks. As a New Jersey district court reviewing a similar ordinance found:

> Much of the "natural scenic beauty" sought to be enhanced appears to have been enhanced by stores, utility poles, commercial billboards, traffic signs, benches, fire hydrants, mail boxes, street signs and houses. In other words, the photographs show that many of the rights of way in question are located in populated, commercial areas where the boxes may even seem at home and not in unspoiled scenic countrysides where the boxes might truly look out of place.

*Southern New Jersey Newspapers, Inc. v. New Jersey Dept. of Transportation*, 542 F.Supp. 173, 186–7 (D.N.J.1982).

None of this is meant to suggest that newsracks could never infringe aesthetic interests outside of a pristine forest.[17] But in the urban environment, to paraphrase Justice Brennan, the court "must be convinced that the city is seriously and comprehensively addressing aesthetic concerns." If newsracks alone are banned and no further steps appear likely, "the commitment of the city to improving its physical environment is placed in doubt." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 531–32, 101 S.Ct. 2882, 2905, 69 L.Ed.2d 800 (1981) (concurring opinion); *see also* Quadres, *Content-Neutral Public Forum Regulations: The Rise of the Aesthetic State Interest, the Fall of Judicial Scrutiny*, 37 HASTINGS L.J. 439, 474–76 (1986).[18] Viewed in this light, the city of

---

**17.** For instance, reconstructed historical communities such as Williamsburg, Virginia or Plymouth Plantations, Massachusetts could persuasively argue that even one prominently visible newsrack would seriously infringe their aesthetic interest in preserving a colonial American appearance. But an aesthetic interest in preserving an entire community's appearance would be hard to find in a city that has placed modern streets and conveniences alongside its historic buildings.

**18.** The need to carefully scrutinize aesthetic justifications for restrictions of expressive activity becomes even clearer upon reviewing the judicial history of the aesthetics rationale. As Professor Quadres points out, aesthetics was not initially regarded as a sufficient justification for restricting fully-protected categories of expressive activity. Quadres, *supra*, at 454–55, 458. Rather, aesthetic interests were first recognized in cases where a non-aesthetic principle supplied the primary justification for restricting speech protected by the First Amendment. In one class of cases, the Supreme Court recognized an aesthetic interest where the speech sought to be regulated already received less than full First Amendment protection, for reasons independent of aesthetic concerns. *See Paris Adult Theater I v. Slaton*, 413 U.S. 49, 57–58, 93 S.Ct. 2628, 2635, 37 L.Ed.2d 446 (1973) (recognizing valid aesthetic interest in barring cinema from screening obscene films even when admission is limited to adult-only audience); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 510–13, 101 S.Ct. 2882, 2893–95, 69 L.Ed.2d 800 (1981) (plurality opinion) (recognizing valid aesthetic interest in prohibiting off-site commercial billboards, but finding ordinance unconstitutional on its face because it also prohibited noncommercial billboards, which were fully protected under the First Amendment); Quadres, *supra*, at 445–47, 461–62. In another class of cases, the Supreme Court gave its approval to regulations of speech deemed aesthetically offensive, but only insofar as the regulations were designed to ameliorate the adverse secondary effects imposed by such speech upon local neighborhoods. *See Young v. American Mini Theatres*, 427 U.S. 50, 56, 71 n. 34, 96 S.Ct. 2440, 2445, 2453 n. 34, 49 L.Ed.2d 310 (1976) (upholding local ordinance requiring geographic dispersal of "adult" theaters, concentrations of which were found to cause increased crime rates and decreased property values); Quadres, *supra*, at 454–59.

Restrictions upon fully-protected categories of speech solely for reasons of aesthetics were permitted only in *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 89, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), which upheld a prohibition upon the posting of signs on public property, as applied to a city council candidate's campaign posters. 466 U.S. at 805–07, 104 S.Ct. at 2129–30; Quadres, *supra*, at 450–51, 461–62. *Vincent* thus represents a new and unchartered area of First Amendment law, placing courts in the novel position of reviewing restrictions upon protected speech by second-guessing aesthetic judgments, which "are necessarily subjective, defying objective evaluation, and [which therefore] must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose." *Metromedia, supra*, 453 U.S. at 510, 101 S.Ct. at 2894 (plurality opinion).

Newport's newsrack ban cannot be justified as part of a serious and comprehensive attempt to address aesthetic concerns. *See Southern New Jersey Newspapers, Inc. v. New Jersey Dept. of Transportation*, 542 F.Supp. 173, 187 (D.N.J.1982). I therefore find that the ordinance at issue fails to advance the city's aesthetic interests.

## 2. Narrowly tailored means

After the interests served by the ordinance in question are ascertained, the court must determine whether the means chosen to advance the interests are narrowly tailored so as to avoid unnecessary restrictions of protected First Amendment activity. *See Grayned v. City of Rockford*, 408 U.S. 104, 116–17, 92 S.Ct. 2294, 2303–04, 33 L.Ed.2d 222 (1972) ("[T]he regulation must be narrowly tailored to further the State's legitimate interest."); *see also Schad v. Borough of Mount Ephriam*, 452 U.S. 61, 70, 101 S.Ct. 2176, 2183–84, 68 L.Ed.2d 671 (1981) (requiring review of zoning ordinances that restrict protected activity to "determine whether those [governmental] interests could be served by means that would be less intrusive on activity protected by the First Amendment....").

Since I have found that the ordinance does not advance the city of Newport's aesthetic interests, the inquiry here is limited to the city's safety interests. As discussed in section II, C, 1, *supra*, the city's safety interests are implicated by the clustering of newsracks at certain sidewalk locations. By narrowing the sidewalk space available to pedestrians, such clustering increases the likelihood of bottlenecks, especially during the summer tourist sea-

son, which encourage pedestrians to walk in the streets, creating safety risks for pedestrians and motorists.

For the ordinance to survive constitutional scrutiny, the city must be able to show that nothing short of a complete newsrack ban on public rights of way could adequately alleviate the safety risks created where newsracks are clustered. The city's argument on this point consists of a conclusory assertion devoid of factual support: "the City of Newport has attempted over the years to control the placement and proliferation of newsracks on public rights-of-way, ... to no avail. The City would prefer that these newsracks be totally removed from public rights-of-way in Newport." [19] Immediately following this statement, the city refers to the affidavit of its City Manager, Francis C. Edwards,[20] which provides only a list of policies sought to be vindicated by the ordinance.

These assertions fail to explain why a total ban would better alleviate the problem of clustering than would spreading out the newsracks more evenly. Since all but four of the forty newsracks in the city's photographs abut previously-installed poles or signposts, the city cannot reasonably argue that one or a few newsracks in a single line with a post would substantially reduce the available sidewalk space. The availability of solutions more narrowly tailored than a complete ban is amply demonstrated by the city's previous set of regulations governing newsracks. Without ruling on the validity of the previous regulatory scheme,[21] the court notes that the

It is worth noting that even the *Vincent* court apparently intended to limit the use of the aesthetics rationale, by insisting that the utility poles on which Vincent sought to hang his campaign signs constituted something less than a traditional public forum, 466 U.S. at 813–15, 104 S.Ct. at 2133–34. Leaving aside the possible criticism of this reasoning, *see, e.g.,* Quadres, *supra*, at 451 n. 64, the fact remains that the Supreme Court has not yet upheld a limitation of fully-protected speech in a traditional public forum for reasons of aesthetics.

**19.** Defendant's memorandum at 4–5.

**20.** Defendant's exhibit A.

**21.** Potential constitutional problems with the prior newsrack ordinance include its requirement that an annual fee of $50.00 per newsrack be paid by each permitee, section 842.03(g), and its requirement that the permitee indemnify the city for at least $100,000 of the potential liability resulting from injuries to persons or property involving newsracks, section 842.04, Codified Ordinances of the City of Newport, Revision of 1980, Chapter 842, "Newspaper Vending Machines," defendant's exhibit A. Courts have ruled that, as applied to newsracks located in a public forum, fees exceeding the proportionate cost of administering the permit ordinance are unconstitutional. *News Printing Co. v. Borough of Totowa*, 211 N.J.Super. 121, 511 A.2d 139,

prior ordinance included rules precisely targeted to the problem of newsrack clustering, including the following:

(b) *Location Specifications.* No newsrack shall be placed, installed, used or maintained:

. . . . .

(7) At any location whereby the clear space for the passageway of pedestrians is reduced to less than six feet;

. . . . .

(10) Within 250 feet of another newsrack containing the same newspaper or news periodical except where separated by a street or corner; or

(11) Facing another newsrack, divided only by the width of a sidewalk or pedestrian walk.

Codified Ordinances of the City of Newport, Revision of 1980, Chapter 842, "Newspaper Vending Machines", section 842.05(b).[22] The city has failed to offer any reason why its interest in maintaining safe pedestrian traffic flow could not be served by this ordinance or by some amendment thereof, e.g., an increase in the minimum sidewalk clearance specification above six feet, or a requirement that newsracks be arranged in linear rows rather than circular clusters. I therefore conclude that the city of Newport's newsrack ban fails the constitutional requirement that it be narrowly tailored, i.e., that it both serve the city's legitimate safety interest and that it avoid unnecessarily restricting protected First Amendment activity. Insofar as this opinion may be read as inviting the city of Newport to amend its ordinance, I must emphasize that my conclusion would be the same whether the ordinance banned newsracks on its face or only in its practical effect.

### 3. Ample alternative channels

■ To pass constitutional muster, an ordinance must satisfy *all* of the criteria by which time, place and manner regulations of expressive activity are measured; the case law lists these criteria as conjunctive requirements, not as alternative ones. *See Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) ("The State may ... enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, *and* leave open ample alternative channels of communication." (emphasis added)). Consequently, since the newsrack ban fails to serve the city of Newport's aesthetic interests and constitutes an insufficiently narrow means of advancing the city's safety interests, the ordinance is unconstitutional irrespective of whether it leaves open ample alternative channels of communication. *See Schneider v. New Jersey,* 308 U.S. 147, 163, 60 S.Ct. 146, 151–52, 84 L.Ed. 155 (1939) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.").

In light of these principles, consideration of the alternative newspaper distribution channels available to the plaintiffs is not necessary. But insofar as the case law cited by the city of Newport on this point reflects a substantial departure from the established analysis of time, place and manner regulations, I believe the city's argument merits further discussion. To show that the newsrack ordinance leaves ample alternative channels of distribution open to the plaintiffs, the city has documented both the number of newsracks on private property currently operated by the plaintiffs and the number of private retail outlets that sell the plaintiffs' newspapers.[23] The city's emphasis on these private channels

---

157–58 (1986); *see also Gannett Satellite Information Network, Inc. v. Metropolitan Transit Authority,* 754 F.2d 767, 774 (2d Cir.1984) (dictum). Courts have also found indemnification requirements unconstitutional as applied to newsracks in a public forum. *Plain Dealer Publishing Co. v. City of Lakewood,* 794 F.2d 1139, 1146–47 (6th Cir.1986); *News Printing Co. v.*

*Borough of Totowa,* 211 N.J.Super. 121, 511 A.2d 139, 158 (1986).

**22.** Plaintiffs' exhibit A.

**23.** Defendant's memorandum at 5, summarized in section I of this opinion, *supra.*

of distribution follows the reasoning of *Plain Dealer Publishing Co. v. City of Lakewood,* 794 F.2d 1139 (6th Cir.1986), which relied upon the accessibility of private retail outlets and of newsracks on private property in concluding that a "total ban of newsracks in residential districts is a constitutional time, place and manner regulation." *Id.* at 1147.

By focusing on private communicative channels rather than alternatives available within the public forum, both the city of Newport and the *Plain Dealer* opinion misstate the applicable law. Ordinarily, when courts apply the ample alternative channels test to restrictions of expressive activity in a public forum, they consider the alternative channels left open within the public forum, not the alternatives available on private property. *See Heffron v. ISKON,* 452 U.S. 640, 654–55, 101 S.Ct. 2559, 2567–68, 69 L.Ed.2d 298 (1981), *followed in Hynes v. Metropolitan Government of Nashville and Davidson County,* 667 F.2d 549, 550–51 (6th Cir.1982); *Olivieri v. Wood,* 766 F.2d 690, 694 (2d Cir.1985); *United States v. Duff,* 605 F.Supp. 216, 218 (D.D.C.1985); *cf. Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 556, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975) (ruling that the availability of a private theater "would not justify" a city's refusal to allow a performance of the musical play "Hair" in its municipal theater); *North Shore Right To Life Committee v. Manhasset American Legion Post No. 304,* 452 F.Supp. 834, 840 (E.D.N.Y.1978) (ordering American Legion to allow anti-abortion group to march in Memorial Day parade, because requiring the group to march separately on the same public streets would "relegate them to an 'undignified position, behind the sweepers'").

Under *Plain Dealer*'s contrary logic, the state would be allowed to restrict public forum access in inverse proportion with the availability of private communicative channels. Constitutional protections of expressive activity in public spaces would be allowed to expand and contract according to the shifting sympathies of local merchants and the oscillations of the business cycle. Such a restrictive view of public forum

access neglects the practical difficulties faced by unpopular speakers and publications that seek to communicate a message to the community at large. "A speaker with a message that is generally unpopular or simply unpopular among property owners is hardly likely to get his message across" if forced to rely on private channels of communication that in theory remain open. *Members of the City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 820, 104 S.Ct. 2118, 2137, 80 L.Ed.2d 772 (1984) (Brennan, J., dissenting). As one commentator has pointed out, the fact that

> private modes of expression, particularly the media, . . . may only be used at great expense, and in contrast to traditional [public] forums, ha[ve the] recognized power to exercise prior restraint on what [they] will disseminate, would seem to mandate greater, rather than lesser, protection of the traditionally low cost open forums, if for no other reason than to preserve a situs for voices otherwise lost in the wilderness.

Quadres, *Content-Neutral Public Forum Regulations: The Rise of the Aesthetic State Interest, the Fall of Judicial Scrutiny,* 37 HASTINGS L.J. 439, 486 (1986).

The fact that the instant case involves established, well-financed newspapers rather than dissident journals published on a shoestring budget is irrelevant from a constitutional standpoint: today's best-seller once was, and may yet again be, just another struggling publication. In short, contrary to the reasoning of *Plain Dealer,* a city may not foreclose the press' right to distribute newspapers on its public streets and sidewalks merely because today's market conditions offer private outlets for such distribution. *Philadelphia Newspapers, Inc. v. Borough of Swarthmore,* 381 F.Supp. 228, 242 n. 8 (E.D.Pa. 1974) ("[D]efendant's contention that the Philadelphia Inquirer is available from [private] sources within the Borough is, from a constitutional standpoint, irrelevant . . . The cases which have upheld prohibition of access or expression in a given location because of the existence of other available locations have based their decisions on the availability of an alternative *public* forum,

not on the possibility that someone would make private property available for that purpose." (citations omitted) (emphasis in original)).

Accordingly, even if the city of Newport's newsrack ban were narrowly tailored to serve a significant government interest,[24] the city's cross-motion for summary judgment would fail for lack of proof that the ordinance left open ample alternative channels of communication within the city's public fora.

### III. CONCLUSION AND ORDER

Relying on the parties' undisputed stipulations of fact, I have found that the city of Newport's prohibition of newsracks from all public rights of way constitutes a content-neutral regulation of protected First Amendment activity in a public forum. Applying the relevant First Amendment law, I have further found that the ordinance cannot be upheld as a permissible time, place and manner regulation of expressive activity in the public forum.

Accordingly, I hereby grant the plaintiffs' motion for summary judgment and the declaratory and injunctive relief requested therein, and I hereby deny the defendant's cross-motion for summary judgment. The city of Newport's prohibition of newsracks from all public rights of way is hereby declared unconstitutional on its face and as applied, and the city of Newport is hereby ordered permanently enjoined from enforcing its unconstitutional newsrack ban.

So ordered.

---

**24.** This aspect of the time, place and manner inquiry also appears to have been watered down by *Plain Dealer.* As discussed at length in subsections II, C, 1 and II, C, 2, *supra,* three separate inquiries are involved in determining whether an ordinance is narrowly tailored to serve a significant government interest: whether the government's asserted interests are significant; whether the ordinance furthers the asserted interest; and whether the ordinance is narrowly tailored so as to avoid unnecessarily restricting expressive activity. In *Plain Dealer,* the appeals court answered all three questions in one sentence, summarily affirming the district court's finding that "safety ... and aesthetics are all substantial government interests and the subject ordinances reach no further than necessary to accomplish the City's objectives." 794 F.2d at 1147. In effect, *Plain Dealer* permitted a general assertion of safety and aesthetic interests to substitute for the requisite findings that the ordinance actually furthers the asserted interests and that the ordinance does not unnecessarily restrict expressive activity.