**GANNETT SATELLITE INFORMATION NETWORK, INC., Plaintiff,**

v.

**The TOWNSHIP OF PENNSAUKEN, Robert Singer, Mayor, and The Township Committee of the Township of Pennsauken, Defendants.**

Civ. A. No. 89–750.

United States District Court,
D. New Jersey.

April 4, 1989.

Archer & Greiner by Robert T. Egan, Haddonfield, N.J., for plaintiff.

Toll, Sullivan & Luthman by David A. Luthman, Cherry Hill, N.J., for defendants.

## OPINION

GERRY, Chief Judge.

### I. FACTS

This case concerns the extent to which a municipality can control the placement of newspaper vending machines without infringing the First Amendment. Our jurisdiction in this matter is founded upon 28 U.S.C. §§ 1343 and 1331.

On February 24, 1989, plaintiff, Gannett Satellite Information Network, Inc., brought an action seeking a temporary restraining order, preliminary injunction and permanent injunction against the enforcement of Pennsauken Township Ordinance No. 88–34. Briefs by both sides were submitted, and a hearing pursuant to F.R. Civ.P. 65(b) was held on March 2, 1989. Both sides have since filed supplemental briefs.

The ordinance at issue treats with the placement of newspaper vending machines, or "honor boxes," in the Westfield Avenue Business District in Pennsauken. In Pennsauken, the Westfield Avenue Business District runs north from the intersection of Westfield Avenue and 42nd Street, which is Pennsauken's border with the City of Camden, for 33 blocks to the intersection of Westfield Avenue and Cove Road. The ordinance was enacted on September 14, 1988, and went into effect on October 14, 1988. It excludes all honor boxes[1] from Westfield Avenue but allows them to be placed "no less than thirty (30) feet from ... Westfield Avenue and side street intersection(s)." Ordinance 88–34, § IV. "For purposes of measurement," the ordinance continues, "the thirty (30) feet distance shall begin from the intersectional curb line

---

1. Defined in the ordinance as "coin operated distribution receptacles for the purchase of newspapers, advertisements and/or brochures...." Ordinance 88–34, § III.

to the point where the curb on Westfield Avenue turns into the curb line on the adjoining side street." *Id.* The ordinance expressly allows for honor boxes "in any other location on any other street throughout the Township of Pennsauken." *Id.* The ordinance further provides that all honor boxes "shall be secured on a level surface such as concrete, or a similar surface. No 'honor boxes' ... shall be chained to any telephone pole, street sign, bus stop sign, or any other similar roadway sign or directional sign within the boundaries of Pennsauken." Ordinance 88–34, § V. Violation of the ordinance is punishable by a $500 fine. Ordinance 88–34, § VII.

A statement of legislative intent was included in the ordinance. The intent was twofold. First, Pennsauken

> is in the midst of a revitalization (and) rehabilitation of the business district commonly known as "Westfield Avenue Business District." Numerous efforts have been made to aesthetically improve and beautify certain portions of the Westfield Avenue Business District. Accordingly, it is the legislative intent of the Township Committee of the Township of Pennsauken to maintain the developed character of Pennsauken Township and to maintain and enhance the aesthetic quality of the business district.

Ordinance 88–34, § II(a). Therefore, honor boxes have been banned from the sidewalks of Westfield Avenue because they "are unsightly and unaesthetic and detract from the aesthetic quality of the business district." *Id.*

The second reason for the ban is that the revitalization of Westfield Avenue is designed

> to attract walking pedestrian customers in and around the Westfield Avenue Business District. It is further determined that motor vehicular stopping to obtain newspapers from "honor boxes" would create a traffic hazard and would be detrimental to the health, safety and welfare of the community of the Township of Pennsauken at large.

Ordinance 88–34, § II(b).

Prior to the passage of this ordinance, Pennsauken permitted honor boxes to be placed on Westfield Avenue subject only to the regulations set forth in N.J.A.C. 16:41B–1–1 *et seq.*, promulgated by the New Jersey Department of Transportation.

Plaintiff, a Delaware corporation, owns both The Courier–Post and USA Today newspapers. The Courier–Post publishes a daily and Sunday newspaper in Southern New Jersey. USA Today is a nationwide newspaper published Monday through Friday. Both newspapers are distributed in the Township of Pennsauken by means of home delivery, private retail outlets and honor boxes. Specifically, there is at least one convenience store located in the Westfield Avenue Business District in which newspapers may be purchased 24 hours a day. Prior to the promulgation of the ordinance, the Courier–Post had four honor boxes on Westfield Avenue in Pennsauken at the intersections of Gross Avenue, Lexington Avenue, 49th Street and 48th Street. These four boxes distributed a combined average of 90 daily and 25 Sunday papers. (Jackson Aff. at ¶ 4.) USA Today had two honor boxes on Westfield Avenue in Pennsauken, which were located at the intersection of Gross Avenue and in front of the post office. These distributed an average of seven papers each day. The USA Today honor boxes are washed and waxed at the beginning of the winter and summer, and refurbished on a routine basis. (Narewski Aff. at ¶ 4.) All unprotected boxes which are exposed to the elements are replaced annually. The Courier–Post honor boxes are inspected regularly by the employee who delivers newspapers to the boxes and are brought in for replacement or repair by an employee whose sole responsibility is to repair and maintain honor boxes. (Jackson Aff. at ¶ 11.)

Shortly after the passage of the ordinance, Gannett removed all of its honor boxes from Westfield Avenue, rather than move them 30 feet in order to comply with the law. Although both the Courier–Post and USA Today have claimed to be losing revenue in the six months since the ordinance took effect (Jackson Aff. at ¶ 12; Narewski Aff. at ¶ ), no figures have been

produced. The removal of all of the Gannett honor boxes has precluded any determination of what effect, if any, the 30-foot asportation of honor boxes would have had on the sale of papers.

At the March 2 hearing, both sides offered arguments concerning the degree to which the visibility of honor boxes is impaired by the ordinance. Pennsauken introduced photographs of Philadelphia Inquirer honor boxes, which it stated were in compliance with the ordinance. Although not located on the curb of Westfield Avenue, they were still apparently easily within view of passing motorists. Gannett challenged this contention and argued that the boxes were in fact more difficult to see if approached from a different angle. Moreover, Gannett noted that because the aim of the ordinance was to improve the appearance of Westfield Avenue by removing the unsightly honor boxes, the effect of the ordinance could only be to diminish the visibility of honor boxes to a motorist on Westfield Avenue. Whether or not honor boxes are less visible to pedestrians was not treated; nor was there any showing of whether newspapers vended in honor boxes are purchased primarily by pedestrians or motorists. Counsel for Pennsauken pointed out that the honor boxes in question are approximately three feet in height, and therefore, while located on the curb of Westfield Avenue, could be completely obscured to passing motorists by a parked car. In short, the evidence as to the diminishment of visibility of honor boxes is inconclusive. Still, because a major purpose of the ordinance was to improve the appearance of Westfield Avenue, it is reasonable to suppose that the ordinance will effect the visibility, in however small a degree, of the "unsightly" honor boxes. However, as has been noted, the extent to which this has discouraged or diminished sales of Gannett newspapers remains unknown.

It was also the testimony of Kenneth W. Carruth, Administrator of the Township of Pennsauken, that the average depth of business lots along Westfield Avenue was 100 feet, and that the 30 foot asportation required by the ordinance, therefore, did not, strictly speaking, exclude honor boxes from the business district at all.

The bulk of the argument and evidence adduced by the Township of Pennsauken has been directed to attacking the assertion made in paragraph 17 of Gannett's complaint that

> [t]he buildings along Westfield Avenue are circa 1950's and, while not in a deteriorated condition, are not particularly attractive or appealing.

Pennsauken has introduced extensive proofs, including photographs and video tape, to show that Westfield Avenue has been in the process of refurbishment for the past two years, and this action has been part of a deliberately laid plan to resurrect a decaying urban district. Pennsauken further argues that the aesthetic interest it has evinced and continues to show justifies the restrictions placed upon Gannett.

Westfield Avenue, from the border with the City of Camden at 42nd Street to the intersection at Cove Road, had long been the center of business and retail activity in Pennsauken but had deteriorated significantly in the past 20 years. In early 1987, according to the Mayor of Pennsauken, "there were fifty percent less open commercial business establishments on Westfield Avenue then [sic] there were 10 years prior to that time." (Singer Aff. at ¶ 8.) This was caused, at least in part, by the urban blight that has increasingly permeated the City of Camden in the past 20 years. In order to remedy the decay before it became irreversible, the Township of Pennsauken has taken several steps.

First, the entire Westfield Avenue Business District was studied by the engineering firm of Taylor, Weissman, Taylor, together with Richard D. Huder, A.I.A., a New Jersey licensed architect. (Singer Aff. at ¶ 13; Carruth Aff. at ¶ 15.) Excerpts from the report issued by this group have been provided to the court. (Carruth Aff., Exh. B.) Specific recommendations included the establishment of a "Design District"; that is, a holistic approach to rejuvenating the appearance of Westfield

Avenue in order to "develop an harmonic streetscape." (Carruth Aff., Exh. B, p. 39.) Other recommendations were the adoption of a detailed sign ordinance and certain zoning changes. (Carruth Aff., Exh. B, pp. 40–53.)

Second, the Township began to "make low or no-interest loans to business owners for the purpose of upgrading the facades and otherwise making the business atmosphere more attractive." (Singer Aff. at ¶ 15.)

Third, the Township, financed with aid from the state and federal government,[2] embarked upon a systematic improvement of the appearance of Westfield Avenue. This project, begun in 1987 and scheduled for completion in 1991, is two-thirds finished now. Red brick tree belts have been laid along much of the length of Westfield Avenue and trees planted. "Old-fashioned" style street lights have been installed, as well as large concrete free-standing trash receptacles. (Carruth Aff. at ¶¶ 20, 21.) Taller telephone poles are being put in place so that less poles will be required. A street sweeper has been employed to clean Westfield Avenue from 42nd Street to Cove Road every weekday. A Township code inspector has also been detailed to Westfield Avenue to ensure compliance with the building code. Defendants supplied this court with a videotape of the scene as one drives from Camden into Pennsauken, and the measures described can fairly be said to have gone a long way towards fulfilling the recommendation that within the area bordering on the City of Camden, "a strong physical statement must be made identifying the fact that this area is part of Pennsauken Township." (Carruth Aff., Exh. B, p. 21.) As the Pennsauken Township Administrator stated:

The Township Administration has taken a very realistic view of the fact that the problems in the City of Camden are immense and are not likely to be solved very quickly. They are also mindful of the ease with which urban blight can creep across a municipal boundary line. For these reasons, the Township has taken such extraordinary measures to revitalize its business district.

(Carruth Aff. at ¶ 16.)

Pennsauken Township has also provided affidavit and photographic evidence of the particular improvements that have occurred along Westfield Avenue. Township Administrator Carruth testified at the March 2 hearing and described in detail most of the photographs and the improvements that had occurred. We will not reiterate all of the improvements along Westfield Avenue in detail, but we list some:

1) The Township has razed the decrepit buildings on Westfield Avenue between 46th and 47th Streets. On this site, an 8–story municipal complex and senior citizen housing facility will be erected. (Singer Aff. at ¶¶ 18, 19.)

2) A Veterans Memorial has been located in a park at Westfield Avenue and Merchantville Avenue. (Singer Aff. at ¶ 17.) The park itself has been re-landscaped. (Carruth Aff. at ¶ 21.)

3) On Westfield Avenue between Cove Road and Scovill Avenue, the facades and awnings of several shops have been made uniform. (Singer Aff. at 35; Carruth Aff. at ¶ 20, Exh. P2, P3, P4.)

4) A boarded-up Acme Supermarket in the block past Scovill Avenue has been refurbished and is now the Trinity Medical Center. (Singer Aff. at ¶ 35; Carruth Aff. at ¶ 20, Exh. P5, P6.)

5) Across from Trinity Medical Center is a newly built supermarket—Costa's. (Singer Aff. at ¶ 35; Carruth Aff. at ¶ 20, Exh. P6.)

6) A new restaurant, Scarpinato's, has been opened at the intersection of Westfield Avenue and Browning Road. (Singer Aff. at ¶ 35.)

7) "Mazie's" liquor store was completely renovated in 1987. (Singer Aff. at ¶ 35; Carruth Aff. at ¶ 21, Exh. P20.)

**2.** Pennsauken received a Neighborhood Preservation Grant and a Balanced Housing Grant from New Jersey, and an Urban Development Assistance Grant (UDAG) from the federal government.

All of these are examples of what defendants consider "the conscious ... commitment of the Township to improve the Avenue working side by side with the business community." (Carruth Aff. at ¶ 22.) Defendants also contend, of course, that all of these measures and improvements have demonstrated a powerful governmental interest in a Westfield Avenue that is "aesthetically pleasing and provides further inducement to commercial activity," (Singer Aff. at ¶ 16), despite the fact that "there are still areas of Westfield Avenue which are not 'particularly attractive or appealing.'" (Singer Aff. at ¶ 36.)

Pennsauken has devoted less effort to the justification of its ordinance as a traffic safety measure. The substance of their argument is stated in Mayor Singer's affidavit:

> The Township is extremely hopeful that even more motor vehicle and pedestrian traffic will appear on Westfield Avenue in the next few years. We are, in fact, mindful that this hope will result in a completely different traffic pattern on the Avenue, and ... (therefore) ... those hazards which the ordinance seeks to address may be more into the future than present.

(Singer Aff. at ¶ 37.)

## II.  LEGAL ANALYSIS

■ Federal courts have the power to strike down municipal ordinances which abridge First Amendment rights. *Hynes v. Mayor of Oradell,* 425 U.S. 610, 616–17, 96 S.Ct. 1755, 1758–59, 48 L.Ed.2d 243 (1976); *Martin v. Struthers,* 319 U.S. 141, 144, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943); *Lovell v. Griffin,* 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1938). At issue in this case are the rights of Gannett and the public to free speech and free press. Gannett charges that Pennsauken Ordinance 88–34 is an unconstitutional time, place and manner restriction and is unconstitutionally vague. It seeks to enjoin the ordinance's limited ban on honor box placement.

To support a preliminary injunction, the moving party must demonstrate that irreparable injury will occur if relief is not granted to maintain the status quo until a final adjudication on the merits can be made and that there is reasonable probability of eventual success on the merits. In addition, the court must weigh the possibility of harm to the nonmoving party as well as to any other interested persons and, when relevant, harm to the public.

*Continental Group, Inc. v. Amoco Chemical Corp.,* 614 F.2d 351, 356–57 (3d Cir. 1980) (footnote omitted). In the present context, the questions of irreparable harm and likelihood of success on the merits are necessarily subsumed into a First Amendment inquiry. If First Amendment rights are being violated, Gannett is likely to succeed on the merits. Similarly, "the loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) (opinion of Brennan, J.); *see also Matter of Providence Journal Co.* 820 F.2d 1342, 1352 (1st Cir.1986), *mod. on rehearing,* 820 F.2d 1354 (1st Cir.1987) (*en banc*), *cert. dismissed,* —— U.S. ——, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988); *Cate v. Oldham,* 707 F.2d 1176, 1188 (11th Cir. 1983); *Community Communications Co., Inc. v. City of Boulder, Colorado,* 660 F.2d 1370, 1376 (10th Cir.1981), *cert. dismissed,* 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982). And if the ordinance is in violation of the First Amendment rights of Gannett and the people, the balance of equities will not aid defendants. Therefore, the issuance of a preliminary injunction will turn solely on whether this ordinance violates the First Amendment. We treat in turn with the issues of time, place and manner and vagueness.

### A.  *Time, Place and Manner*

■ It is unquestioned that a necessary predicate to freedom of speech and press is the freedom to disseminate ideas, information and newspapers in public places. *Talley v. California,* 362 U.S. 60, 63, 80 S.Ct. 536, 538, 4 L.Ed.2d 559 (1960); *Lovell v. Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938). Accordingly, the distribution of newspapers

through honor boxes or newsracks is protected under the First Amendment. *City of Lakewood v. Plain Dealer Publishing Co.,* — U.S. —, 108 S.Ct. 2138, 2145, 100 L.Ed.2d 771 (1988). However, the freedom of a publisher to decide where on the streets and sidewalks of a municipality it wishes to place its honor boxes is subject to municipal regulation so long as that regulation passes muster under the "time, place and manner test." *Consolidated Edison Co. v. Public Service Comm'n.,* 447 U.S. 530, 535, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980); *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212 (1972).

■ The criteria for constitutional regulation of the time, place and manner of speech are (1) the regulation must be content neutral; (2) the regulation must be narrowly tailored to serve a significant state interest; and (3) the regulation must leave open ample alternative channels of communication. *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804–05, 104 S.Ct. 2118, 2128–29, 80 L.Ed.2d 772 (1984); *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). Here, defendant has sought to regulate the positioning of honor boxes in a public forum. The traditional public fora include places such as streets and parks, which "by long tradition or by government fiat have long been devoted to assembly or debate." *Providence Journal Co. v. City of Newport,* 665 F.Supp. 107, 110–11 (D.R.I.1987), *quoting Perry Education Ass'n v. Perry Local Educators Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). *See also Frisby v. Schultz,* — U.S. —, 108 S.Ct. 2495, 2499, 101 L.Ed.2d 420 (1988).

Therefore, the "challenged ordinance faces an 'especially heavy' burden of justi-

fication." *Providence Journal Co.,* 665 F.Supp. at 111, *quoting Southern New Jersey Newspapers, Inc. v. New Jersey Dept. of Transportation,* 542 F.Supp. 173, 185 (D.N.J.1982). However, we are also aware that a municipal regulation that implicates the First Amendment does not necessarily abridge it. *City of Lakewood,* 108 S.Ct. at 2150.

■ Because the ordinance at issue in this case applies to all honor boxes, it is content neutral. The fact that Gannett now sells no papers in Pennsauken through honor boxes while the Philadelphia Inquirer does is the result of Gannett's own action.

We also think that ample alternative channels of communication remain. The ordinance does not absolutely ban honor boxes. Although they must be moved 30 feet, they can remain on the street, still in the business district and still in a public forum.[3] The complete absence of Gannett's honor boxes from the Westfield Avenue Business District has been caused by Gannett's unilateral action in removing them.

We turn, then, to the crux of the case: does Pennsauken have a significant interest, and is the ordinance narrowly tailored to serve that interest?

We first address the safety interest asserted by Pennsauken. As we have seen, the safety rationale as expressed by Pennsauken is predicated upon an anticipation of increased traffic on Westfield Avenue. This increase, it is urged, would lead to increased motor vehicular stopping to buy papers from honor boxes which would create a traffic hazard.

■ Although safety is undoubtedly a significant government interest, broad assertions of a safety interest, without evidence to substantiate them, cannot survive

---

**3.** Pennsauken argued at the March 2 hearing that the presence of a convenience store from which newspapers may be purchased 24 hours a day on Westfield Avenue is another alternate channel of communication. But whether the presence of a private disseminator of information can serve as an alternate channel is a disputed question, and we need not reach it here. *Compare Chicago Newspaper Publishers v.*

*City of Wheaton,* 697 F.Supp. 1464, 1470 (N.D. Ill.1988) ("[t]he availability of private sellers is irrelevant"); *Providence Journal Co. v. City of Newport,* 665 F.Supp. 107, 118 (D.R.I.1987) (same), *with Plain Dealer Publishing Co. v. Lakewood,* 794 F.2d 1139, 1147 (6th Cir.1986), *aff'd on other grounds,* — U.S. —, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (existence of alternative channels on private property considered).

when the First Amendment is implicated. *Providence Journal Co.*, 665 F.Supp. at 113; *Southern New Jersey Newspapers*, 542 F.Supp. at 186. In this case, Pennsauken has provided no evidence of any accidents or complaints resulting from honor boxes. Moreover, vehicular safety concerns are more appropriately addressed by traffic ordinances, and not by regulation of constitutionally protected activity. *Southern New Jersey Newspapers* at 186.

Lastly, although there has been no showing in this case as to what sort of purchaser patronizes honor boxes, we are aware that another judge in our district found that "honor boxes are intended to serve pedestrians and are placed on or near sidewalks where there is heavy pedestrian traffic." *Id.* at 177. Therefore, we find that Pennsauken has not advanced a significant governmental interest in traffic safety, and that the ordinance is not narrowly tailored to serve that interest, even if it were a valid interest.

Pennsauken's asserted interest in aesthetics presents us with a far more knotty question. Gannett urges us to adopt the test propounded by Justice Brennan in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 101. S.Ct. 2882, 69 L.Ed.2d 800 (1981). That case concerned a First Amendment challenge to municipal billboard regulations. There was no single opinion for the Court. In his opinion concurring in the judgment, Justice Brennan argued that in order to sustain a city-wide ban on billboards, a municipality must show that such a ban "would have more than a negligible impact on aesthetics." *Id.* at 530–31, 101 S.Ct. at 2904 (Brennan, J., *concurring* in the judgment). Justice Brennan added:

> Of course, it is not for a court to impose its own notion of beauty on San Diego. But before deferring to a city's judgment, a court must be convinced that

the city is seriously and comprehensively addressing aesthetic concerns with respect to its environment. Here, San Diego has failed to demonstrate a comprehensive coordinated effort in its commercial and industrial areas to address other obvious contributors to an unattractive environment.

*Id.* at 531, 101 S.Ct. at 2904.

This test has since been applied to regulation of newsracks and honor boxes. *Chicago Newspaper Publishers*, 697 F.Supp. at 1470; *Providence Journal Co.*, 665 F.Supp. at 115; *Southern New Jersey Newspapers*, 542 F.Supp. at 186, n. 25.

We are not at all certain, however, that this approach is mandated by the Supreme Court. In *Metromedia*, seven justices explicitly concluded that the city's interest in preventing visual clutter was enough to justify a prohibition of billboards. 453 U.S. at 507–08, 510, 101 S.Ct. at 2892–93, 2893 (opinion of White, J., joined by Stewart, Marshall and Powell, JJ.); *id.* at 552, 101 S.Ct. at 2915 (Stevens, J., *dissenting in part; id.* at 559–561, 101 S.Ct. at 2919–20 (Burger, C.J., *dissenting*); *id.* at 570, 101 S.Ct. at 2924 (Rehnquist, J., *dissenting*). And in *The City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), a majority on the Court expressly rejected the stringent test proposed by Justice Brennan. *Id.* at 807, n. 25, 104 S.Ct. at 2130, n. 25.[4]

In addition, several policy reasons militate against the adoption of too exacting a judicial scrutiny in the area of aesthetics. First, as Justice Brennan has noted, there is "the unavoidable subjectivity of aesthetic judgments—the fact that 'beauty is in the eye of the beholder.'" *Vincent* at 822, 104 S.Ct. at 2138 (Brennan, J., *dissenting*). Although Justice Brennan argues that this subjectivity calls for more searching judicial scrutiny, *id.* at 824–825, 104 S.Ct. at

---

**4.** *Vincent* concerned a First Amendment challenge to a city-wide ban on the posting of political signs on public property. The majority found that the city's aesthetic interest in avoiding visual clutter was sufficient to uphold the ordinance. 466 U.S. at 816–17, 104 S.Ct. at 2134–35. In dissent, Justice Brennan reiterated

the test he had propounded in *Metromedia*. 466 U.S. at 821, 828–831, 104 S.Ct. at 2137, 2141–42 (Brennan, J, *dissenting*) and criticized the majority for its "lenient approach towards the restriction of speech for reasons of aesthetics...." *Id.* at 818, 104 S.Ct. at 2136.

2139, it is possible that this argument cuts another way. As Justice Rehnquist noted:

> Nothing in my experience on the bench has led me to believe that a judge is in any better position than a city or county commission to make decisions in an area such as aesthetics. Therefore, little can be gained in the area of constitutional law, and much lost in the process of democratic decisionmaking, by allowing individual judges in city after city to second-guess such legislative or administrative determinations.

*Metromedia*, 453 U.S. at 570, 101 S.Ct. at 2925 (Rehnquist, J., *dissenting*).

But whatever the merits of this debate, it is evident that a municipal aesthetic interest often concerns more than mere civic beautification of the Arbor Day variety. "[Aesthetic] interests are both psychological and economic. The character of the environment affects the quality of life and the *value of property* in both residential and commercial areas." *Vincent*, 466 U.S. at 817, 104 S.Ct. at 2135 (emphasis added). In this case, the Township of Pennsauken has made it clear that its aesthetic interest is rooted in a desire to save a once flourishing business district from the urban blight that has sadly befallen its neighbors in the City of Camden, and not an abstract wish to make the Westfield Avenue vista more charming. We think that this interest is at least as compelling as the interest in preventing visual clutter that was upheld in *Vincent*. We share the concern that aesthetic interests may be asserted by the government as a blind for "dubious or flatly deplorable social ends." Costonis, *Law & Aesthetics: A Critique and a Reformation of the Dilemmas*, 80 Mich.L.Rev. 355 (1982). But we are satisfied that such is not the case in the matter presently before us. We therefore must dispute the contention that *Vincent* places us "in the novel position of reviewing restrictions upon protected speech by second-guessing aesthetic judgments...." *Providence Journal*, 665 F.Supp. at 115, n. 18. Our analysis is akin to that proposed by Justice White's plurality opinion in *Metromedia*, which found that aesthetic interests "must be carefully scrutinized to determine if they are *only a*

*public rationalization of an impermissible purpose.*" 453 U.S. at 510, 101 S.Ct. at 2894 (emphasis added).

Also, we are troubled by Justice Brennan's dicta to the effect that

> ... a historical community such as Williamsburg, Va., should be able to prove that its interests in aesthetics and historical authenticity are sufficiently important that the First Amendment value attached to billboards must yield.... And I would be surprised if the Federal Government had much trouble making the argument that billboards could be entirely banned in Yellowstone National Park, where their very existence would so obviously be inconsistent with the surrounding landscape. I express no view on whether San Diego or other large urban areas will be able to meet the burden.

*Metromedia*, 453 U.S. at 534, 101 S.Ct. at 2906 (Brennan, J., *concurring the judgment*). Cases which have applied Justice Brennan's analysis in honor box cases seem to have adopted this dicta as well. For instance, in *Providence Journal*, the court denied that "newsracks could never infringe aesthetic interests outside of a pristine forest." 665 F.Supp. at 115. In a footnote, it added:

> For instance, reconstructed historical communities such as Williamsburg, Virginia or Plymouth Plantations, Massachusetts could persuasively argue that even one prominently visible newsrack would seriously infringe their aesthetic interest in preserving a colonial American appearance. But an aesthetic interest in preserving an entire community's appearance would be hard to find in a city that has placed modern streets and conveniences alongside its historic buildings.

*Id.* at 115, n. 17. *See also Southern New Jersey Newspapers*, 542 F.Supp. at 186–87 ("[M]any of the rights-of-way in question are located in populated, commercial areas where the honor boxes may even seem at home and not in unspoiled scenic countrysides where the boxes might look truly out of place"). If these examples signal a

trend towards a two-tiered approach to aesthetics in which national parks and historical areas are *per se* afforded greater deference than municipalities, we must disagree. As the First Circuit stated:

> Urban dwellers, as well as country residents and travelers have an interest in the quality of their surroundings.... Moreover, to designate one area as, so to speak, second class, might not only inspire complaints, but would tend to impede improvement.

*John Donnelly & Sons v. Campbell*, 639 F.2d 6, 13 (1st Cir.1980), *aff'd* 453 U.S. 916, 101 S.Ct. 3151, 69 L.Ed.2d 999 (1981); *see also Metromedia*, 453 U.S. at 570, 101 S.Ct. at 2924 (Rehnquist, J., *dissenting*) ("In my view, the aesthetic justification alone is sufficient to sustain a total prohibition of billboards within a community, regardless of whether the particular community is 'a historical community such as Williamsburg' or one as unsightly as the older parts of our major metropolitan areas. Such areas should not be prevented from taking steps to correct, as best they may, mistakes of their predecessors"); *Vincent*, 466 U.S. at 807, 104 S.Ct. at 2130, *quoting Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 71, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976) (opinion of Stevens, J.) ("[T]he city's interest in attempting to preserve [or improve] the quality of urban life is one that must be accorded high respect").

Therefore, under the approach followed by the Supreme Court in *Vincent* and the plurality in *Metromedia*, we find that Pennsauken has asserted a significant interest in aesthetics.

Even if we are in error in rejecting the criteria suggested by Justice Brennan in *Metromedia*, we believe that Pennsauken's ordinance still passes constitutional muster. Even under the more stringent Brennan test, Pennsauken has adduced abundant evidence to show that it is "seriously and comprehensively addressing aesthetic concerns with respect to its environment." *Metromedia* 453 U.S. at 531, 101 S.Ct. at 2905 (Brennan, J., *concurring* in the judgment). It has undertaken several specific improvements in accordance with a detailed and thorough plan. The removal of honor boxes is just one facet of the plan. Indeed, we are at a loss to envision how a municipality could do more than Pennsauken has "to demonstrate a comprehensive coordinated effort in its commercial ... areas to address other obvious contributors to an unattractive environment." *Id.*

Gannett stresses Justice Brennan's insistence that a municipality show that the ordinance will have "more than a negligible impact on aesthetics." They point out that the honor boxes are maintained in good condition, and that Westfield Avenue is, after all, a place where "[m]uch of the 'natural scenic beauty' sought to be enhanced appears to [consist of] stores, utility poles, commercial billboards, traffic signs, benches, fire hydrants, mail boxes, street signs and houses." *Southern New Jersey Newspapers*, 542 F.Supp. at 186. In such an area, which is "not particularly attractive or appealing" (Complaint, ¶ 17), Gannett argues that its honor boxes can hardly be denoted as eyesores.

This argument fails for two reasons. First, it places the court in the untenable position of making an independent determination of the relative beauties of Westfield Avenue and Gannett's honor boxes. Like the Judgment of Paris, such a choice will embitter the loser. But worse, for our purposes, to make such a choice would place us in the position of "reviewing restrictions upon protected speech by second-guessing aesthetic judgments...." *Providence Journal*, 665 F.Supp. at 115, n. 18. Yet it was from so subjective a standard that Justice Brennan's test was intended to deliver us. "An objective standard for evaluating claimed aesthetic judgments is therefore essential; for without one, courts have no reliable means of assessing the genuineness of such claims." *Vincent*, 466 U.S. at 823, 104 S.Ct. at 2138 (Brennan, J., *dissenting*). Under *Vincent*, courts must determine whether a municipality is making a sincere and determined effort to improve its appearance. Under Justice Brennan's test, our scrutiny would be especially strict. But even so, all we can do is seek "to develop a reliable means of gauging the nature or depth of the City's commit-

ment...." *Id.* at 827, 104 S.Ct. at 2140. Courts cannot serve as arbiters of aesthetic value.

The second flaw in Gannett's argument has been treated above; that is, the implied bifurcation between "scenic and historic" locations which have valid aesthetic interests and everything else. As stated above, we think that such a distinction is subjective and unfair.[5]

We therefore hold that under either the approach of the *Vincent* court or under the Brennan concurrence in *Metromedia,* Pennsauken has demonstrated that it has a significant state interest in aesthetics. We now turn to examine whether the challenged ordinance is narrowly tailored to serve that interest.[6]

Unlike previous cases in which honor box regulation has been struck down, the ordinance here cannot in any way be characterized as a complete ban on honor boxes in any section of Pennsauken. *Chicago Newspaper,* 697 F.Supp. at 1470; *Providence Journal,* 665 F.Supp. at 112; *Southern New Jersey Newspapers,* 542 F.Supp. at 177. Here, newspapers may still be vended by honor box in areas well within the Westfield Avenue Business District. Although their visibility to motorists on Westfield Avenue is reduced, that reduction in visibility is the valid aesthetic interest to be served. Unlike a total ban, the boxes are not invisible to a motorist. And they are likely to remain as visible and available to a pedestrian who is desirous of buying a paper as they were before.[7] In light of the extensive record made by Penn-

sauken on their determined and continuing efforts to upgrade Westfield Avenue, we think that requiring honor box patrons to travel an extra 30 feet is a narrow enough restriction to bear.

We find, therefore, that the 30–foot restriction in Pennsauken Ordinance 88–34 is a valid regulation of time, place and manner of speech under the First Amendment.

■ Gannett has also challenged the requirement in Section V of the ordinance that the honor boxes not be chained to a utility, but be "secured" on a level surface. Pennsauken has advanced safety and aesthetic rationales for this regulation and argues that it is a valid regulation of time, place and manner.

For largely the same reasons expressed above, we reject the notion that Pennsauken has made out a permissible safety interest. There is nothing in the record to suggest that the cause of safety in Pennsauken can be furthered by securing honor boxes in concrete, rather than chaining them to poles.

Pennsauken has also asserted an aesthetic interest, based on the perception that the practice of chaining honor boxes to utility poles "looks just plain terrible." (Singer Aff. at ¶ 28.) Evidence in the record shows that the claim in Gannett's brief that Pennsauken also chains trash cans and baskets to poles is untrue. Testimony at the March 2 hearing by Township Supervisor Carruth made it plain that concrete trash receptacles on Westfield Avenue are secured by steel pins in the concrete sidewalk.

---

5. Significantly, Justice Brennan's dissent in *Vincent* contained no hint of such a bifurcation but was devoted to arguing that only with a "comprehensive and seriously pursued program to promote an aesthetic objective," a city would be able to sustain a ban on posting signs on public property. 466 U.S. at 828, 829–30, 104 S.Ct. at 2141, 2142 (Brennan, J., *dissenting*).

6. We note at the outset that, while the ordinance must be narrowly tailored, "it is *not* necessary that the regulation provide the least restrictive alternative necessary to serve the governmental interest in question," *Woodbury Daily Times Company, Inc. v. Township of Monroe,* 610 F.Supp. 916, 918 (D.N.J.1985) (emphasis in original), so long as the other conditions of a valid

time, place and manner restriction on speech are met. Here they have been.

7. It is even arguable that, given the validity of the aesthetic interest, the restriction is under-inclusive; that is, if the honor boxes are a detraction to the appearance of Westfield Avenue, they should be banned. The fact that they have not been shows that the aesthetic interest is not being served by this ordinance. But we think it would be a Pyrrhic victory for First Amendment principles to encourage municipalities to completely ban honor boxes when they are willing to adopt less draconian measures. Moreover, a complete ban would risk closing off a channel of alternative communications. *See supra* at p. 536.

A more credible attack on the aesthetic interest in unchained honor boxes is the fact that Section V of the ordinance applies to the entire Township of Pennsauken and is not limited to the Westfield Avenue Business District. Gannett also points out that chaining is less expensive, does not diminish the mobility of honor boxes, and effectively minimizes vandalism and theft. (Jackson Aff. at ¶ 9; Narewski Aff. at ¶ 7.) Thus, Gannett argues there is no valid aesthetic interest, and the regulation is not narrowly tailored.

However, we are bound by the Supreme Court's finding that "municipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression." *Vincent*, 466 U.S. at 806, 104 S.Ct. at 2129. As we have explained above, our inquiry, where a content-neutral regulation furthering a substantial governmental goal is at issue, is limited under *Vincent* to making sure that the ordinance is not designed as persiflage to mask an improper purpose. For the reasons we have stated above, we refrain from passing on whether or not we find chaining honor boxes to be aesthetically pleasing or distasteful. We can conceive of no improper purpose here and therefore must accept that Pennsauken's aesthetic interest is a valid one.[8]

Because the elimination of the practice of chaining honor boxes is a substantial government interest, it follows that the ordinance is narrowly tailored. As in *Vincent*,

[h]ere, the substantive evil—visual blight—is not merely a possible byproduct of the activity, but is created by the medium of expression itself. [T]herefore, the application of the ordinance in this case responds precisely to the substantive problem which legitimately concerns the City. The ordinance curtails no more speech than is necessary to accomplish its purpose.

466 U.S. at 810, 104 S.Ct. at 2131. We therefore find that Section V of Ordinance 88–34 is a valid restriction of the time, place and manner of speech under the First Amendment.

**B.** *Vagueness*

Gannett has attacked the location requirements of the ordinance as being unconstitutionally void for vagueness. To reiterate, the ordinance provides that honor boxes be placed 30 feet from "the intersectional curb line to the point where the curb on Westfield Avenue turns into the curb line on the adjoining side street." Ordinance 88–34, Section IV. Gannett claims that, because corners in Pennsauken are curved, this dictate is impossible to understand. Gannett also complains that the requirement that honor boxes be "secured on a level surface, such as concrete, or a similar surface," is unconstitutionally vague because "secured" could mean "affixed, bolted, nailed, cemented, resting on, glued, or even imbedded." (Plaintiff's Brief at p. 32.)

The reasons for overturning vague legislation have been clearly set forth:

The evils of a vague law are: that it may trap the innocent person, who must at least be given a reasonable opportunity to know what is prohibited and act accordingly; that it may foster arbitrary enforcement by failing to provide explicit standards for police; that it impermissibly delegates policy matters to police; and finally, that it may have a chilling effect on protected freedoms.

*Woodbury Daily Times*, 610 F.Supp. 916, 918 (D.N.J.1985); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). "Because First Amendment freedoms need breathing space to survive, government may regulate only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

---

**8.** We may point out, however, that the chaining requirement most likely would not pass muster under the more restrictive standard of review proposed by Justice Brennan in *Metromedia* and

*Vincent*. There has been no showing of a comprehensive program to improve the aesthetic quality of any section of Pennsauken outside of Westfield Avenue.

542

We do not think, however, that either of these provisions are so vague as to violate due process. As to the meaning of "secure," it seems that Pennsauken and Gannett both have an interest in seeing that honor boxes remain stationary. We see nothing unconstitutionally vague about leaving it for Gannett to devise the cheapest effective means. Similarly, any dispute as to the point from which the 30–foot distance should be measured will at most mean a difference of two feet and perhaps only a difference of inches. We believe that the parties could reach an understanding, with any effort. Although the ordinance must be read with specificity, it should also be read with common sense. We frankly do not believe that any of the evils inherent in vague legislation are lurking here.

## III. CONCLUSION

For all of these reasons, we find that Gannett has not suffered an abridgement of their First Amendment freedoms. Accordingly, no preliminary injunction will be issued. The accompanying order has been entered.